

Villanova University School of Law

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-28-2000

# Times Mirror Magazines v. Las Vegas Sports News

Precedential or Non-Precedential:

Docket 99-1299

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Times Mirror Magazines v. Las Vegas Sports News" (2000). *2000 Decisions.* Paper 86.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/86

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 28, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1299

TIMES MIRROR MAGAZINES, INC.

v.

LAS VEGAS SPORTS NEWS, L.L.C.,
d/b/a LAS VEGAS SPORTING NEWS,
        Appellant.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 98-cv-05768)
District Judge: Honorable Bruce W. Kauffman

Argued: January 13, 2000

Before: Alito, Barry and Aldisert, Circuit Judges.

(Filed: April 28, 2000)

        Malcolm J. Gross (Argued)
        Gross, McGinley, LaBarre & Eaton
        Allentown, PA
         Attorney for Appellee

        Diane S. Danoff (Argued)
        Dechert, Price & Rhoads
        Philadelphia, PA
         Attorney for Appellant

OPINION OF THE COURT

ALDISERT, Circuit Judge.

The issue on appeal is whether the district court erred by preliminarily enjoining Las Vegas Sports News, L.L.C., d/b/a Las Vegas Sporting News ("LVSN"), from using the phrase "Sporting News" in connection with its weekly sports-betting publication under the Federal Trademark Dilution Act of 1995, 15 U.S.C. S 1125(c) ("FTDA" or "Act"). The district court concluded that Times Mirror Magazines Inc., owner of the federally registered mark "The Sporting News," was likely to succeed on the merits of its dilution claim against LVSN, because the mark was "famous" in its niche market and LVSN's use of the title Las Vegas Sporting News on its publication diluted the Times Mirror's mark by blurring its distinctiveness.

The district court had jurisdiction over the dilution claims pursuant to 15 U.S.C. S 1121(a) and 28 U.S.C. S 1338. We have jurisdiction pursuant to 28 U.S.C. S 1292(a)(1). This appeal by LVSN was timelyfiled under Rule 4, Federal Rules of Appellate Procedure.

LVSN contends that the district court erred by granting Times Mirror preliminary injunctive relief because Times Mirror failed to establish a likelihood of success on the merits of its dilution claim or immediate irreparable harm. We must decide whether the district court erred by holding that (a) the mark "The Sporting News" was famous in the sports periodicals market; (b) LVSN's use diluted the strength of Times Mirror's mark by blurring its distinctiveness and (c) Times Mirror's 15-month delay in bringing suit did not preclude a finding that LVSN's use would immediately cause irreparable harm to Times Mirror.

In reviewing the grant or denial of a preliminary injunction, we consider the following:

> 1. The law has entrusted the power to grant or dissolve an injunction to the discretion of the trial court in the first instance, and not to the appellate court.

2

2. Unless the trial court abuses that discretion, commits an obvious error in applying the law or makes a serious mistake in considering proof, the appellate court must take the judgment of the trial court as presumptively correct.

3. This limited review is necessitated because the grant or denial is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief.

4. In exercising its limited review of the grant or denial of preliminary injunctive relief, the appellate court asks: (a) Did the movant make a strong showing that it is likely to prevail on the merits? (b) Did the movant show that, without such relief, it would be irreparably injured? (c) Would the grant of a preliminary injunction substantially have harmed other parties interested in the proceedings? (d) Where lies the public interest?

5. The applicant for a preliminary injunction bears the burden of establishing that a right to such injunctive relief and that irreparable injury will result to him of it is not granted. Moreover, we have emphasized the elementary principle that a preliminary injunction shall not issue except under a showing of irreparable injury.

A.O. Smith Corp. v. FTC, 530 F.2d 515, 525 (3d Cir. 1976); see Loretangeli v. Critelli, 853 F.2d 186, 193 (3d Cir. 1988).

I.

In 1886, the phrase "The Sporting News" was granted federal trademark registration and since that time has been the banner headline on a weekly publication, entitled The Sporting News. The mark's present owner, Times Mirror Magazines, Inc., publishes The Sporting News and operates an internet website devoted to its publication at <http://www.sportingnews.com>.

The Sporting News provides its readers with information on baseball, basketball, football and hockey, and has a weekly circulation of approximately 540,000 in the United States and Canada. The Sporting News does not provide any information on gambling, because Times Mirror "believe[s] that there is a portion of the population that is adamantly opposed to gambling and that they would not look favorably on any of [its] products if they thought [the magazine was] promoting gambling in any way." D. Ct. Op. at 2 (alteration in original). The magazine is advertised on television, in direct mail solicitations, in promotions and occasionally on the radio. It is typically sold for $2.99, but nine special content issues are sold each year for $3.99. Over the last several years, Times Mirror has invested millions of dollars in The Sporting News in an attempt to improve the quality of its magazine and to increase readership.

LVSN publishes Las Vegas Sporting News, which contains articles, editorials and advertisements on sports wagering "for the sports gaming enthusiasts or individuals that like to take a risk." App. at 41 (Testimony of LVSN publisher, Dennis Atiyeh). Las Vegas Sporting News is published 45 times a year and generally has a circulation of 42,000, but some special editions have had a circulation of up to 100,000. The publication is sold for $2.99 at several hundred newsstands across the country, but most copies are given away in gambling casinos free of charge.

In 1997, LVSN publisher Dennis Atiyeh changed the name of his publication from Las Vegas Sports News to Las Vegas Sporting News. The publisher says that he changed the publication's title for two reasons: (1) the previous publisher of Las Vegas Sports News had a poor reputation, having fallen into disrepute with gambling casinos and (2) the term "sporting" more accurately reflected the publication's content, because the publication was a"sports gaming" publication, and not purely a "sports publication." D. Ct. Op. at 3. Atiyeh admits that at the time he changed the name of his publication, he was familiar with Times Mirror's publication The Sporting News. Since the 1997 name change to Las Vegas Sporting News, circulation of the publication has increased, but not substantially.

4

Times Mirror first learned that LVSN was publishing Las Vegas Sporting News in August 1997. On September 24, 1997, Times Mirror sent LVSN a cease and desist letter, which read in part:

> It has recently come to my attention that your company is marketing a sports magazine entitled Las Vegas Sporting News. Apparently, this is a relatively recent change, since the masthead page of your magazine makes reference to Las Vegas Sports News, stating, in part, that, "Las Vegas Sports News . . . is published weekly . . . ."
>
> . . . . It would appear that your company is attempting to unlawfully appropriate the good will that is associated with our federally registered trademark.
>
> In view of the likelihood of consumer confusion, we hereby demand that you (1) immediately cease and desist from any further use of the term "Las Vegas Sporting News," and (2) select a name to identify your product that is not confusingly similar to our "The Sporting News" trademark.

App. at 263-264 (citations omitted).

LVSN had not ceased using the phrase "Sporting News" in connection with its weekly publication. In October 1998, after settlement negotiations between Times Mirror and LVSN proved unsuccessful, Times Mirror retained Glenn Hauze, a private investigator in Pennsylvania, "to gain as much information as possible regarding the availability of the Las Vegas Sporting News," in anticipation of litigation. App. at 31. Hauze began his investigation by visiting three newsstands in or around Lehigh Valley, Pennsylvania. The first newsstand he visited was in Plumsteadville, and it carried both The Sporting News and Las Vegas Sporting News. Las Vegas Sporting News "was up on the shelf with the other sporting magazines," but The Sporting News "was down amongst the tabloids." D. Ct. Op. at 6. The following day, Hauze found copies of Las Vegas Sporting News for sale at newsstands in Allentown and Quakerville. At the Allentown newsstand, Las Vegas Sporting News and The Sporting News were displayed within inches of each other in

5

a bay window in front of the store, along with a large
number of other sporting type publications.

John Kastberg, vice-president of Times Mirror's The
Sporting News, conducted his own investigation in
December 1998, during which he visited three newsstands
in New York City:

> I went to a newsstand in Penn Station which is a train
> terminal in New York, I went to Barnes & Noble in New
> York and I went to a newsstand in Grand Central
> Terminal which is another train station in New York.
> . . . [W]hen I went to Penn Station I asked the guy "Do
> you have the Las Vegas Sporting News," and he
> handed me the Times Mirror Sporting News. . . . I went
> to the Barnes & Noble, asked the same question, got
> Times Mirror Sporting News and the same thing
> happened at Grand Central. All three times I was
> handed the Times Mirror Sporting News when I asked
> for Las Vegas Sporting News.

App. at 24-25.

Two weeks after Hauze's investigation, Times Mirrorfiled
a complaint in district court, charging LVSN with infringing
Times Mirror's registered mark in violation of section 32 of
the Lanham Act, 15 U.S.C. S 1114(1); with false designation
of origin in violation of section 43(a) of the Lanham Act, 15
U.S.C. S 1125(a); with trademark dilution in violation of
section 43(c) of the Lanham Act, 15 U.S.C. S 1125(c); and
with common law unfair competition and infringement.

On December 3, 1998, both parties participated in an
evidentiary hearing on Times Mirror's motion for a
preliminary injunction, in which it sought to enjoin LVSN
from using the phrase "Sporting News" on its publication.
In its March 4, 1999 Order and Memorandum Opinion, the
district court concluded that Times Mirror was likely to
succeed on the merits of its federal trademark dilution
claim and consequently granted Times Mirror's request for
a preliminary injunction, thereby enjoining LVSN from
using the phrase "Sporting News" in connection with its
weekly publication. The district court granted the
preliminary injunction solely on trademark dilution by
blurring grounds and did not consider Times Mirror's other

claims. The parties subsequently agreed inter alia that the preliminary injunction would be stayed pending appeal to this court.

II.

The Federal Trademark Dilution Act of 1995 provides:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. S 1125(c)(1).

The federal cause of action for trademark dilution grants extra protection to strong, well-recognized marks even in the absence of a likelihood of consumer confusion--the classical test for trademark infringement--if the defendant's use diminishes or dilutes the strong identification value associated with the plaintiff 's famous mark. 4 McCarthy on Trademarks and Unfair Competition S 24:70 (4th ed. 1997). The dilution doctrine is founded upon the premise that a gradual attenuation of the value of a famous trademark, resulting from another's unauthorized use, constitutes an invasion of the senior user's property rights in its mark and gives rise to an independent commercial tort for trademark dilution. Id.

To establish a prima facie claim for relief under the federal dilution act, the plaintiff must plead and prove:

> 1. The plaintiff is the owner of a mark that qualifies as a "famous" mark in light of the totality of the eight factors listed in S 1125(c)(a),
>
> 2. The defendant is making commercial use in interstate commerce of a mark or trade name,
>
> 3. Defendant's use began after the plaintiff 's mark became famous, and

7

4. Defendant's use causes dilution by lessening the capacity of the plaintiff 's mark to identify and distinguish goods or services.

See 4 McCarthy, supra, S 24:89; see also Hershey Foods Corp. v. Mars, Inc., 998 F. Supp. 500, 504 (M.D. Pa. 1998) (quoting 4 McCarthy, supra). A court may consider the following eight non-exclusive factors in determining the famousness vel non of a mark:

(A) the degree of inherent or acquired distinc tiveness of the mark;

(B) the duration and extent of use of the mark  in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading are a in which the mark is used;

(E) the channels of trade for the goods and se rvices with which the mark is used;

(F) the degree of recognition of the mark in t he trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same o r similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. S 1125(c)(1)(A)-(H).

The district court held Times Mirror established a likelihood of success on the merits of its federal dilution claim against LVSN, because (1) Times Mirror's mark"The Sporting News" was famous; (2) LVSN made commercial use in interstate commerce of the name "Las Vegas Sporting News"; (3) Times Mirror's mark became famous before LVSN began using the name "Las Vegas Sporting News" and (4) LVSN's use of that name diluted the strength of"The

8

Sporting News" mark. Because Appellant only challenges the first and last prongs of Times Mirror's prima facie claim for dilution, we focus our attention on the district court's findings that "The Sporting News" is a famous mark under the Act and that LVSN's use diluted the strength of Times Mirror's mark.

III.

LVSN argues that the district court erred in granting Times Mirror a preliminary injunction because its mark "The Sporting News" is not famous and because the court did not make a separate finding as to the distinctiveness of Times Mirror's trademark.

A.

Appellant contends that "The Sporting News" cannot be famous under the Act because it is not famous to the general public, and "substantial case law indicates that marks famous in a specialized market, rather than well-known to the general public, should not be considered `famous' under the federal dilution statute." Appellant Br. at 23 (citing Washington Speakers Bureau, Inc. v. Leading Authorities, Inc., 33 F. Supp.2d 488, 503 (E.D. Va. 1999)). However, in the case Appellant cites for its theory, the court did not specifically adopt or reject a niche market theory for fame. See Washington Speakers Bureau, Inc., 33 F. Supp.2d at 503 ("In the instant case, it is ultimately unnecessary to resolve this still-unsettled question, since even if fame in a niche market were sufficient to establish fame under the Act, consideration of the statutory factors reveals that [the plaintiff] has failed to make even this demonstration."). Thus, this case is not particularly helpful to our analysis.

We recognize that not all courts' decisions have been precise in addressing the question whether a mark can be famous in a niche market. The Court of Appeals for the Seventh Circuit has addressed the niche market debate:

> At an initial glance, there appears to be a wide variation on this issue [of whether a mark famous in a niche market is entitled to protection under the FTDA].

9

Some cases apparently hold that fame in a niche market is insufficient for a federal dilution claim, while some hold that such fame is sufficient. However, a closer look indicates that the different lines of authority are addressing two different contexts. Cases holding that niche-market fame is insufficient generally address the context in which the plaintiff and defendant are using the mark in separate markets. On the other hand, cases stating that niche-market renown is a factor indicating fame address a context . . . in which the plaintiff and defendant are using the mark in the same or related markets.

Syndicate Sales, Inc. v. Hampshire Paper Corp. , 192 F.3d 633, 640 (7th Cir. 1999) (internal footnotes omitted); see also Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 222 (2d Cir. 1999) ("[D]ilution can occur where the[defendant's] use competes directly with the [plaintiff 's] as well as where the [defendant] is in a non-competing market. In general, the closer the products are to one another [in the marketplace], the greater the likelihood of both confusion and dilution.").

The Restatement (Third) of Unfair Competition lends further support to the theory that niche market fame is sufficient to protect a mark from dilution within that market:

A mark that is highly distinctive only to a select class or group of purchasers may be protected from diluting uses directed at that particular class or group. For example, a mark may be highly distinctive among purchasers of a specific type of product. In such circumstances, protection against a dilution of the mark's distinctiveness is ordinarily appropriate only against uses specifically directed at that particular class of purchasers . . . .

Restatement (Third) of Unfair Competition S 25 cmt. e (1995 Main Vol.); see 4 McCarthy, supra,S 24:112. We are persuaded that a mark not famous to the general public is nevertheless entitled to protection from dilution where both the plaintiff and defendant are operating in the same or related markets, so long as the plaintiff 's mark possesses a high degree of fame in its niche market.

10

The district court determined that Times Mirror and LVSN competed in the same, or at least significantly related, markets--namely, the sports periodicals market. LVSN contends that its readers, who essentially are interested in wagering on sports, are distinct from the readers of The Sporting News, who are interested in sports generally. We find such a distinction to be without merit. Surely many, if not the vast majority, of those individuals who gamble on sports in Las Vegas also follow the sports on which they are wagering. We conclude therefore that the district court did not err by finding that LVSN and Times Mirror shared a common market. Because a mark can be famous in a niche market where the mark has a high degree of distinctiveness within the market and where the plaintiff and defendant operate within or along side that market, we hold that the district court did not commit an obvious error by holding that the mark "The Sporting News" was famous in its niche and therefore entitled to protection under the FTDA against LVSN's use of a similar mark in the same market.

B.

LVSN also argues that "The Sporting News" is not famous because it is merely a descriptive mark and does not satisfy the eight statutory factors for fame listed in 15 U.S.C. S 1125(c)(1)(A)-(H). Because Appellant disputes the district court's factual findings with regard to fame and its application of the S 1125(c)(1) fame factors, we review each factor of the district court's analysis and will not reverse unless the district court committed an obvious error in applying the law or made a serious mistake in considering the proof presented. See A.O. Smith, 530 F.2d at 525.

The district court concluded that "The Sporting News" mark was famous under S 1125(c)(1) for the following reasons:

> First, "The Sporting News" is a federally registered trademark. Because a mark does not qualify for federal trademark registration unless it is distinctive, see 15 U.S.C. S 1052, federal registration goes a long way toward proving that the mark has inherent or acquired

11

distinctiveness. Second, "The Sporting News" has been used on the magazine's banner headline since 1886. Third, The Sporting News is advertised on television, in direct mail solicitations and promotions, and, occasionally, on the radio. In recent years, Times Mirror has spent millions of dollars improving the magazine. Fourth and finally, Times Mirror uses "The Sporting News" trademark throughout the United States and Canada and on the internet.

D. Ct. Op. at 8-9 (internal quotation marks, footnotes and citations omitted). We now review the district court's analysis of the famousness of the mark "The Sporting News" and its application of the eight non-exclusive statutory factors for famousness set forth in Part II, supra.

1.

Applying the first factor under 15 U.S.C. S 1125(c)(1), the district court determined that "The Sporting News" had a high degree of distinctiveness in the sports periodicals market. Although the district court did not elaborate on this finding, its factual conclusion was not erroneous.

The degree of acquired or inherent distinctiveness of a mark bears directly upon the issue of whether that mark is famous. See 15 U.S.C. S 1125(c)(1)(A). The mark "The Sporting News" is not inherently fanciful or creative, and thus the mark does not have a high degree of inherent distinctiveness. We must therefore examine the degree to which the mark has acquired distinctiveness by gaining secondary meaning over time in the marketplace. To determine whether a trademark has acquired distinctiveness by the attachment of secondary meaning, we examine the following considerations: (1) the length or exclusivity of use of the mark; (2) the size or prominence of the plaintiff 's enterprise; (3) the existence of substantial advertising by the plaintiff; (4) established place in the market and (5) proof of intentional copying. I.P. Lund Trading v. Kohler Co., 163 F.3d 27, 42 (1st Cir. 1998). The district court concluded that "The Sporting News," although not a fanciful or arbitrary trademark, has acquired secondary meaning, and thus distinctiveness in the sports

12

periodicals market, because it has been used in commerce since 1886 and because Times Mirror has expended millions of dollars in advertising and promoting their mark through various media outlets. Times Mirror presented evidence to support several of the considerations for acquired distinctiveness set forth in I.P. Lund . We therefore conclude that the district court did not err by finding that "The Sporting News" had gained secondary meaning and a high degree of distinctiveness in its market.

2.

The district court also found that the second statutory factor--extent and duration of use of the mark--weighed in favor of finding the mark famous, because The Sporting News has been continuously published since 1886. See S 1125(c)(1)(B). We find that the district court did not err in this respect.

3.

The district court found that the third statutory factor-- extent and duration of advertising--weighed in favor of finding the mark famous, because Times Mirror presented credible proof of extensive advertising and additional publicity from the Internet. See S 1125(c)(1)(C). Here, too, the district court did not err.

4.

The fourth factor is the geographical extent of the trading area in which the mark is used. See S 1125(c)(1)(D). Since 1886, The Sporting News has grown to a circulation of over 540,000 in both Canada and the United States, as well as a recent internet site. The district court found this evidence supported a finding that the mark was famous and we will not disturb it.

5.

The fifth and sixth factors for fame are the degrees of recognition of the mark in its channels of trade and the

degree of recognition of the mark in the trading areas, see S 1125(c)(1)(E)-(F), and the seventh factor is the nature and extent of the use of a same or similar mark by third parties, see S 1125(c)(1)(G). The district court did not explicitly address these factors in its opinion. Nevertheless, the FTDA does not require that courts strictly apply every factor in the statute. See S 1125(c)(1) (providing that "a court may consider factors such as, but not limited to") (emphasis added). It was not an abuse of its discretion for the court to omit explicit discussion of these factors in its analysis, because the majority of the other fame factors weighed in favor of finding the mark famous.

6.

Finally, the district court determined that the eighth factor--whether the mark was registered--favored Times Mirror, because "The Sporting News" was registered in 1886. See S 1125(c)(1)(H).

Accordingly, we hold that the district court did not err by concluding that "The Sporting News" mark was famous in the sports periodicals market.

IV.

As a final argument against the district court'sfinding that "The Sporting News" mark was famous, LVSN contends that S 1125(c)(1) requires that a mark be subject to a test for fame and a separate test for distinctiveness under the FTDA. Although some courts agree with Appellant's contention,1 we are persuaded that this interpretation is inconsistent with the language and construction of the statute.

To be sure, S 1125(c)(1) does state that a court may consider eight statutory factors, among others,"[i]n determining whether a mark is distinctive and famous." 15

_____

1. See, e.g., Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 216 n.2 (2d Cir. 1999) ("McCarthy's treatise contends that the statute does not include an independent requirement of distinctiveness. . . . We disagree.")

14

U.S.C. S 1125(c)(1) (emphasis added). We believe, however, that "distinctiveness" as used in S 1125(c)(1) is only a synonym for "fame." Any other reading of the statutory language will result in the statute being redundant because the first statutory factor for fame is "the degree of inherent or acquired distinctiveness" of the mark. See S 1125(c)(1)(A); see also 4 McCarthy, supra, S 24:91 ("[T]here is . . . no separate statutory requirement of `distinctiveness,' apart from a finding that the designation be a `mark' that is `famous.' `Distinctiveness' is used here only as a synonym for `fame.' ").2 If a mark is famous, then it is presumed distinctive. See Viacom, Inc. v. Ingram Enterprises, Inc., 141 F.3d 886, 890 n.6 (8th Cir. 1998). We conclude that there is no separate statutory requirement of distinctiveness apart from a finding of fame.

V.

LVSN argues also it was obvious error for the district court to apply Judge Sweet's test for "dilution by blurring" found in Mead Data Central, Inc. v. Toyota Motor Sales, Inc., 875 F.2d 1026, 1035 (2d Cir. 1989) (Sweet, J., concurring).

Before discussing the mechanics of Judge Sweet's Mead Data test for dilution, we first explain how trademark dilution can occur. A trademark can be diluted two different ways: by blurring or by tarnishment. Only dilution by blurring is at issue in this appeal. "Blurring" in this context means "to make dim, indistinct or indefinite." Webster's Third New International Dictionary 243 (1968). Blurring occurs when the defendant's use of its mark causes the public to no longer associate the plaintiff 's famous mark with its goods or services; the public instead begins associating both the plaintiff and the defendant with the famous mark. See I.P. Lund, 163 F.3d at 47–48; 4

_____

2. The Trademark Review Commission Report, the impetus behind the FTDA, stated: "The same type of evidence which is traditionally used to prove distinctiveness can be used to prove fame. Although the registrant is not required to prove distinctiveness apart from the import of registration, any additional evidence of distinctiveness will ordinarily be
entitled to substantial weight." Report of the Trademark Review Commission, 77 Trademark Rep. 375, 459–460 (1987).

15

McCarthy, supra, S 24:70. Dilution by blurring takes place when the defendant's use of its mark causes the identifying features of the plaintiff 's famous mark to become vague and less distinctive. To prove dilution by blurring, the owner of a famous mark must prove that the capacity of its mark to continue to be strong and famous would be endangered by the defendant's use of its mark. See 4 McCarthy, supra, S 29:94.

To determine whether LVSN's use blurred, and therefore diluted, Times Mirror's mark for "The Sporting News," the district court applied the dilution factors set forth in Judge Sweet's concurrence in Mead Data:

1. similarity of the marks

2. similarity of the products covered by the marks

3. sophistication of consumers

4. predatory intent

5. renown of the senior mark

6. renown of the junior mark

Mead Data, 875 F.2d at 1035 (Sweet, J., concurring); see D. Ct. Op. at 10-11.

Several courts and commentators have criticized Judge Sweet's dilution test as the offspring of classical likelihood of confusion analysis and not particularly relevant or helpful in resolving issues of dilution by blurring. See, e.g., 4 McCarthy, supra, S 24:94.1; see also, e.g., I.P. Lund, 163 F.3d at 49-50 (reiterating the criticisms of Judge Sweet's dilution by blurring test). Instead of outright rejection of the Sweet factors, most courts have improved upon the test's shortcomings by supplementing the Sweet test with other considerations more pertinent to the issue of dilution. See, e.g., Nabisco, 191 F.3d at 227 ("We think it would be a serious mistake at the outset of our consideration of the new federal antidilution statute to limit ourselves to these six factors or to any other putatively definitive list."). In Nabisco, the Court of Appeals for the Second Circuit articulated a more complete set of factors for dilution by blurring, including

actual confusion and likelihood of confusion, shared
customers and geographic isolation, the adjectival
quality of the junior use, and the interrelated factors of
duration of the junior use, harm to the junior user,
and delay by the senior user in bringing the action.

Id. at 228. Because we consider the dilution analysis in
Nabisco helpful, we apply it to facts found by the district
court.

The district court concluded that

[t]his criticism [of Judge Sweet's dilution test]
notwithstanding, blurring sufficient to constitute
dilution requires a case-by-case factual inquiry, and in
this case, the Court finds that the Sweet factors are
useful in evaluating the likelihood that LVSN's use of
Las Vegas Sporting News lessens the capacity of The
Sporting News to identify and distinguish Times
Mirror's goods or services.

D. Ct. Op. at 11-12 (internal quotation marks and citations
omitted). Applying the Sweet factors, the district court
concluded that Times Mirror was likely to prevail on its
dilution claim based on the following facts:

First, the two marks are similar. Not only do the two
marks use dominant identical words, i.e., the words
"Sporting News," but they both print those words in
red lettering on a single line that spans horizontally
across the publication's cover, which generally features
a well-known sports figure. Las Vegas Sporting News
and The Sporting News use different type styles, and
LVSN outlines its mark in black whereas Times Mirror
outlines its mark in black and white. The lettering thus
is distinguishable, but similar nevertheless. Second,
both LVSN and Times Mirror use their mark to cover a
weekly publication. Third, the undisputed testimony
indicated that consumers do not purchase [these]
publications in a sophisticated manner, but tend to
select their purchase on "impulse," largely based on
the publication cover rather than the content. Fourth,
the similarity of the marks and their placement on the
publication cover might be coincidental, but the
evidence showed that the publisher of Las Vegas

17

Sporting News was aware of The Sporting News  at the time he changed the name of his periodical. Finally, The Sporting News is well known, whereas Las Vegas Sporting News is not.

D. Ct. Op. at 12-13. We hold that the district court did not make an obvious error in applying these facts to Judge Sweet's factors. Although the district court applied Judge Sweet's test and did not explicitly adopt the Nabisco factors or any other supplemental dilution factors, our application of the Nabisco dilution factors to the facts supports the district court's conclusion that LVSN diluted "The Sporting News" mark by blurring its distinctive qualities.

Actual confusion has been shown to exist among those selling the two publications, even though no consumer surveys were submitted to the district court during the preliminary injunction hearing. The evidence presented at the hearing supports the finding that a strong likelihood of confusion is present, because LVSN's mark and publication cover are very similar to Times Mirror's mark and the cover of The Sporting News. Sufficient evidence supports a finding that customers who purchase these sports publications are "unsophisticated consumers," because they often buy on impulse and because the publications are relatively inexpensive. Unsophisticated buyers lack the discrimination and "are more vulnerable to confusion, mistake and misassociations against which the trademark protects." Nabisco, 191 F.3d at 220. Furthermore, LVSN has a short duration of use because its first use of its new publication name was in 1997.

Finally, Times Mirror did not unreasonably delay in brining an action against LVSN. Times Mirror first discovered the publication Las Vegas Sporting News in August 1997. One month later, Times Mirror sent LVSN a cease and desist letter, thereupon triggering a series of correspondence and negotiations between the parties. Times Mirror's delay was attributable to its belief that LVSN would change the name of its publication. Once negotiations failed, Times Mirror filed suit. Thus, Times Mirror did not unduly delay filing an action against LVSN.

After weighing the dilution factors from Judge Sweet's Mead Data concurrence as supplemented by the Nabisco

18

analysis, we conclude that the district court did not err by finding that Times Mirror was likely to prevail on the merits of its dilution claim.

VI.

LVSN contends also that the district court erred by granting the preliminary injunction, because Times Mirror failed to show that it would suffer irreparable harm if the injunction was not issued. On this point, the district court stated:

> In the trademark context, irreparable harm may be shown even in the absence of actual injury to plaintiff 's business based on plaintiff 's demonstration of a likelihood of success on the merits of its claim. The Court therefore finds that in the absence of an injunction, Times Mirror will suffer irreparable harm.

D. Ct. Op. at 13-14 (internal quotation marks and citations omitted).

We have held that a lack of control over the use of one's own mark amounts to irreparable harm. See Opticians Ass'n v. Independent Opticians, 920 F.2d 187, 195 (3d Cir. 1990) (stating that potential damage to a mark holder's reputation or goodwill or likely confusion between parties' marks constitute irreparable injury for the purpose of granting a preliminary injunction). LVSN argues that the 15-month delay, beginning when Times Mirror was on notice of the new name of LVSN's publication and ending when Times Mirror filed suit against LVSN, necessarily shows that Times Mirror's injury, if any, is not immediate and irreparable. This argument does not persuade us, because the 15-month delay was attributable to negotiations between the parties. We conclude that the district court did not err by determining that Times Mirror would be irreparably harmed if the preliminary injunction did not issue.

*   *   *

We have also considered Appellant's contentions that the district court erred by determining that the benefits from

19

preliminary injunctive relief outweighed the injury such relief would cause LVSN and that the public interest would be served by granting Times Mirror's motion for a preliminary injunction. Neither contention has sufficient merit to warrant further discussion.

The judgment of the district court will be affirmed.

BARRY, Circuit Judge, Dissenting.

How famous a mark must be before it can be afforded protection under the Federal Trademark Dilution Act ("FTDA") is a question of first impression in this Circuit, a question which implicates the expansion of trademark rights under the Lanham Act and one which has received much judicial attention elsewhere since the passage of the FTDA. The correct answer to this question is of critical importance in order that an appropriate balance between free competition and property rights be maintained. [1] The majority holds that the District Court did not err in finding that "The Sporting News" mark was sufficiently famous to merit protection under the FTDA. Because I conclude that Times Mirror has not shown and, in my view, cannot show that it is likely to satisfy the threshold fame requirement, I respectfully dissent.

I.

Fame means FAME

The FTDA offers little guidance as to what is required to find a mark famous. Thus, courts must rely on legislative history and, where helpful, look to dilution theory which has developed over years of judicial interpretation of state anti-dilution statutes. Dilution theory in the United States emanated from a 1927 Harvard Law Review article which posited that protection against dilution would fill the gap in trademark law left by infringement theory which only provided protection when a junior user applied a deceptively similar mark to similar goods to confuse a competitor's consumers about the source of the goods. See

---

1. Commentators have warned that expansion of a dilution cause of action could harm competition. See, e.g. , Mark A. Lemley, The Modern Lanham Act and the Death of Common Sense, 108 Yale L. J. 1687 (May 1999); Glynn S. Lunney, Jr., Trademark Monopolies, 48 Emory L. J. 367 (Spring 1999); William Marroletti, Dilution, Confusion, or Delusion? The Need for a Clear International Standard to Determine Trademark Dilution, 25 Brook. J. Int'l L. 659 (1999); Robert N. Klieger, Trademark Dilution: The Whittling Away of the Rational Basis for Trademark Protection, 58 U. Pitt. L. Rev. 789 (Summer 1997).

Frank I. Schechter, The Rational Basis of Trademark Protection, 40 Harv. L. Rev. 813, 825 (1927). In the absence of a dilution cause of action, trademark law was unable to protect mark owners from the unauthorized use of a deceptively similar mark placed upon dissimilar or non-competing goods. Before passage of the FTDA, state anti-dilution statutes attempted to fill this gap in trademark law. However, because truly famous marks -- and"truly" will become the operative word here -- are ordinarily used on a nationwide basis but only half of the states provided remedies for dilution, Congress recognized the need for a federal anti-dilution statute. See H.R. Rep. No. 104-374, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. 1029. Accordingly, the FTDA was passed to fill the gap and "to bring uniformity and consistency to the protection of famous marks." See id. at 3.

Historically, the Lanham Act has attempted to balance the two competing goals of protecting consumers and protecting a trademark owner's investment. The FTDA, however, is concerned only with the latter:

> It does not have those twin public policy goals of the laws of trademark infringement[.] As a result there may be a kind of judicial restraint about the new law. The perception may be that it does not carry any compelling need to protect the public, and that it benefits only a coterie of American business elite, not the general public.

Jerome Gilson, 2 Trademark Protection & Practice (1999) S 5.12[1][e] at 5-272 to 5-273 (hereinafter "Gilson"). Moreover, there can be little doubt that Congress sought to protect only a select and narrow class of truly famous and well-recognized marks. "Without such a requirement, an anti-dilution statute becomes a rogue law that turns every trademark, no matter how weak, into an anti-competitive weapon." 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, (4th ed. 1999) S 24:108 at 24-210 (hereinafter "McCarthy"). "To save the dilution doctrine from abuse by plaintiffs whose marks are not famous and distinctive, a large neon sign should be placed adjacent wherever the doctrine resides, reading: `The Dilution Rule: Only Strong Marks Need Apply.' " 4 McCarthy S 24:108 at

22

24-209; see also 2 Gilson S 5.12[1][b] at 5-260 (referring to class of trademarks protected by FTDA as "Supermarks").

The legislative history of the Act is crystal clear that Congress intended courts to be highly selective in determining which marks are famous and accorded those truly famous marks an unprecedented degree of protection. A 1987 Report of the Trademark Review Commission of the United States Trademark Association (USTA) emphasized how limited this universe should be: "We believe that a limited category of trademarks, those which are truly famous and registered, are deserving of national protection from dilution[.] We therefore urge the adoption of a highly selective federal dilution statute[.]" Trademark Review Commission, Report & Recommendations, 77 Trademark Rep. 375, 455 (1987).2 The Report of the Senate Judiciary Committee on the precursor to the FTDA stated that the 1988 bill

>     creates a highly selective federal cause of action to protect federally registered marks that are truly famous from dilution of the distinctive quality of the mark. The provision is specifically intended to address a narrow category of famous registered trademarks where the unauthorized use by others, on dissimilar products for which the trademark is not registered, dilutes the distinctiveness of the famous work[.]
>
>     Section 43(c) of the Act is to be applied selectively and is intended to provide protection only to those marks which are both truly distinctive and famous, and therefore most likely to be adversely affected by dilution. To protect these special marks, and to ensure that the bill does not supplant the current protection of trademarks based on the likelihood of confusion, the committee amended the legislation to place greater emphasis on the factors the courts must weigh in determining whether a mark possesses a sufficient

_____

2. In 1988, legislation based on the Commission's proposal for a dilution statute limited only to "famous marks" was approved by the Senate, but did not survive in the House of Representatives. Subsequently, the Commission's proposal became, in large part, the basis for the FTDA. See 4 McCarthy S 24:87.

level of fame and distinctive quality to qualify for federal protection from dilution.

S. Rep. No. 100-515 (reproduced in 6 McCarthy App. A5, at 41-42)(emphasis added). Examples of truly famous marks cited in a House Report on the FTDA included "Buick", "Dupont", and "Kodak". See H.R. Rep. No. 104-374, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. 1029, 1031. In a nutshell, the legislative history amply supports the conclusion that the FTDA should be restricted to a narrow category of marks, ensuring that it does not swallow infringement law by allowing mark owners to end-run a likelihood of confusion analysis which they fear-- or, indeed, know -- they cannot win.

Despite Congressional intent that the FTDA protect only a narrow category of truly famous marks, some early judicial interpretations of the Act granted dilution protection after engaging in only a cursory analysis (or no analysis at all) of the fame of the mark. See , e.g., Gazette Newspapers, Inc. v. New Paper, Inc., 934 F. Supp. 688, 696-97 (D. Md. 1996)(no separate analysis of fame); Hasbro, Inc. v. Internet Entertainment Group, Ltd. , No. 96-130, 1996 WL 84853 (W.D. Wash. Feb. 9, 1996)(entering preliminary injunction on dilution claim without discussing fame). Little if any analysis, of course, would be required to find marks such as "Buick", "Dupont" or "Kodak" truly famous or, in the context of sports with which we deal here, that the mark "New York Yankees" is so famous that even non-sports fans are well aware of it. If, however, marks which are not such household names can be protected by the Act -- and, in my view, that is a big "if " -- those marks must be subjected to a rigorous analysis. As one commentator has noted with some alarm:

> [C]ourts thus far have shown little inclination to limit protection to the truly famous marks envisioned by the drafters of the [FTDA]. Instead, the courts, when they acknowledge the fame requirement at all, simply state a mark's fame in conclusory terms without attention to the eight fame factors. Unless courts strictly adhere to the admittedly vague dictates of the federal dilution statute, federal dilution protection will surely give rise to a broad regime of trademark rights in gross.

24

Robert N. Klieger, Trademark Dilution: The Whittling Away of the Rational Basis for Trademark Protection, 58 U. Pitt. L. Rev. 789, 68 (Summer 1997).

This concern has not gone unnoticed, and courts are now taking pains to emphasize the rigor of the fame requirement. For example, the Ninth Circuit recently set itself apart from the expansive interpretations of the FTDA by other courts by vacating a permanent injunction after finding that plaintiff 's trademarks were not sufficiently famous for FTDA protection and remanding with instructions to enter summary judgment for defendant. See Avery Dennison Corp. v. Sumpton, 189 F.3d 868 (9th Cir. 1999). There, Avery Dennison, the seller of office supplies and industrial fasteners, sued an Internet e-mail business which offered "vanity" e-mail addresses, alleging that defendant's maintenance of the domain name registrations  and <dennison.net> diluted Avery Dennison's trademarks. The "Avery" mark had been in continuous use since the 1930s and had been registered since 1963. The "Dennison" mark had been in continuous use since the late 1800s and registered since 1908. See Avery Dennison, 189 F.3d at 873. Avery Dennison's annual advertising expenditures exceeded $5 million, and its annual sales reached $3 billion (although no evidence indicated what percentage of these dollar figures applied exclusively to the "Avery" or "Dennison" trademarks as opposed to the company's other marks). See id. Avery Dennison also maintained its own website.

After reviewing dilution theory and the legislative intent behind the FTDA, the Court emphasized the role of the fame requirement in "reinstating the balance" in the Lanham Act to avoid "over-protecting trademarks, at the expense of potential non-infringing uses." Id . at 875. Despite the fact that the registered marks had acquired distinctiveness and that four of the eight statutory fame factors favored a finding that the marks were famous, the Ninth Circuit held that, as a matter of law, Avery Dennison had failed to meet its burden of proving fame for two reasons. Id. at 876-77. First, while recognizing that fame in a "specialized market segment" might be adequate if the "diluting uses are directed narrowly at the same market

segment," the Court noted that Avery Dennison provided no evidence of customer overlap or that defendant's customers possessed any degree of recognition of plaintiff 's marks. Id. at 877-78. Second, widespread third-party use of the names "Avery" and "Dennison" undermined the famousness of the marks. Id. at 878. Thus, the Court held that the marks were not entitled to protection under the FTDA. See also I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 46 & 49 (1st Cir. 1998)(finding mark not famous and noting "mark [must] be truly prominent and renowned"; "courts should be discriminating and selective in categorizing a mark as famous"); G. Kip Edwards, Developments in Dilution Law, 579 PLI/Pat 209, 217 (Nov.-Dec. 1999)(noting that many early judicial interpretations of the FTDA neglected to heed Congressional intent that the Act be applied sparingly to truly famous marks and mistakenly granted protection to marks that were "famous" only within a specialized market niche (citing Gazette Newspapers), but noting that the "pendulum may be swinging back toward protection only of truly famous marks" (citing Avery Dennison)).

If one heeds the legislative history, it is simply beyond the pale to find "The Sporting News" mark to be another "Buick", "Dupont", or "Kodak", names which have long been associated in the public's eye with a particular company or a particular product and which immediately strike one as being truly famous. Stated somewhat differently, tofind that "The Sporting News" mark meets the fame requirement, thus entitling it to the extraordinary protection the FTDA provides -- a nationwide injunction -- would defeat Congress's deliberate design.

II.

Insufficient evidence of fame

The majority, after paying lip service to the fame requirement, holds that the District Court did not err by concluding that "The Sporting News" mark is famous in the sports periodicals market, a "niche market". I disagree. For starters, the legislative history does not mention much less

26

embrace a so-called "niche market" theory of fame.3 Beyond
that, the niche market theory risks lowering the bar for
trademark protection unless it is applied prudently to cases
which clearly call for such an analysis, and this is not one.
For one thing, The Sporting News is directed at the general
public via subscriptions and at newsstands, thereby
begging the question: is not the general public the
appropriate universe for assessing the fame of the mark?
But even if fame exclusively within the sports periodicals
market would be enough to establish fame under the FTDA,
the paltry evidence here does not permit any suchfinding.
Moreover, I take issue with the rather cursory discussion
by the majority, and by the District Court, of the eight
statutory factors for fame.

The fundamental problem with the majority's application
of the niche market theory, sometimes known as the"big
fish in a small pond theory," to the facts of this case is that
it is hard to conceive of any consumer goods or services
that are not in a narrow market of some type, be it luxury
cars, cameras, or sporting publications.

> Courts approving the "big fish in a small pond" theory
> of trademark dilution fail to recognize that it threatens
> to overrun trademark infringement law. Trademark

---

3. The only reference in the legislative history that even comes close to
suggesting a so-called "niche-market" theory is found in a discussion of
the degree of a mark's recognition, where the Trademark Review
Commission noted that dilution might occur with respect to one universe
of consumers, but not necessarily to another. "For example, if a mark is
famous at the industrial level but not at the consumer level, protection
may be appropriate at the industrial level but not at the consumer level."
77 Trademark Rep. at 461. This reasoning may provide the basis for the
application of a niche market theory within a specialized industrial
niche. See, e.g., Syndicate Sales, Inc. v. Hampshire Paper Corp., 192 F.3d
633, 640 (7th Cir. 1999)(finding niche market fame sufficient under
circumstances in which both parties operated within the narrow
wholesale market for plastic baskets used for funeral floral bouquets);
Avery Dennison, 189 F.3d at 877-78 (involving markets for office
products, industrial fasteners and e-mail addresses); Teletech Customer
Care Management (California), Inc. v. Tele-Tech Co., Inc., 977 F. Supp.
1407 (C.D. Cal. 1997)(involving "teleservicing industry" where both
parties provided services for large corporate clients).

27

infringement law permits similar, or even identical, marks to coexist on non-competing goods. If even a locally famous mark can preclude all other marks in every channel of trade, then conceivably every trademark can be used to create a monopoly in a word or symbol -- a proposition clearly contrary to the intent and practice of trademark law. It is possible tofind virtually any mark to be "famous" within some market, depending on how narrowly that market is defined.

Courtland L. Reichman, State and Federal Trademark Dilution, 17 Franchise L. J. 111, 133 (Spring 1998).

If marks can be "famous" within some market, depending on how narrowly that market is defined, then the FTDA will surely devour infringement law. Indeed, the unauthorized use of a mark in the same or a similar market is precisely what good old-fashioned infringement principles have traditionally been there to remedy once actual confusion or likelihood of confusion has been shown, and there is simply no need for dilution principles. Can one imagine a clearer case for application of those principles than if one were to begin manufacturing automobiles and calling those automobiles "Buick"? Similarly, if the parties here operate within the sports periodicals market, then this case, at least in my view, is a garden variety infringement case, and the complaint alleges just that.

Congress was quite clear, however, that the FTDA was not designed for situations in which ordinary infringement law provided a remedy but, rather, for those situations in which a truly famous mark on dissimilar products  deserves, but cannot receive, protection under infringement law -- those situations in which, for example, no one would ever confuse that truly famous mark with the goods or services to which it has been wrongly attached. Congress was explicit as to where protection was warranted: "DUPONT shoes, BUICK aspirin, and KODAK pianos." H.R. Rep. No. 104-374, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. at 1030. The extensive relief the FTDA authorizes, which gives the owner of the famous mark a virtual monopoly by precluding all others from using the mark "regardless of the presence or absence of . . . competition between the owner of the famous mark and other parties, or likelihood of

confusion," is itself something federal trademark law had not before seen, and surely was not meant to be accorded to any marginally "famous" mark. 15 U.S.C.S 1127. It follows inexorably that if a mark is famous in the general public, it is also famous in its niche market and, in such a case, dilution and infringement theories need not be mutually exclusive. Before, however, a Court categorically adopts the theory that a mark that is not generally renowned, but famous only in its niche market, is entitled to protection under the FTDA, the evidence of fame should be rigorously examined. Had such an examination been performed here, only one conclusion could have been reached: the evidence of fame is woefully lacking.

A. Factor (F)

The FTDA lists eight non-exclusive statutory factors for fame which a court may but is not required to consider. The "may" is important because it would make little sense to require that a mark which immediately strikes one as truly famous -- again, "Buick", "Dupont", or "Kodak" -- be analyzed for fame in accordance with these factors, although certainly such an analysis would confirm the immediate impression of fame. The less truly famous a mark is, however, the more rigorous the analysis of the statutory factors must be in light of the evidence of record.

It is Factor (F), "the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought," which gives the FTDA's fame requirement its "teeth." As the majority notes, however, the District Court did not explicitly address this factor -- and neither did the majority.

The guidance which Factor (F) affords to courts is somewhat murky. The Act, for example, does not define "channels of trade," although presumably that phrase means the chain of distribution of the goods featuring the mark in question, i.e. the route by which the goods travel to the ultimate consumer -- here, from the publisher to the reader. Importantly, although Factor (F) focuses the analysis on the channels of trade in which the parties

29

operate, it does not dictate the conclusion that fame solely within those channels of trade is enough for protection under the FTDA.

According to the legislative history, a finding of fame "requires substantial renown or fame within both the trading area of the mark and the trading area of the other party to the dilution suit." S. Rep. No. 100-515 (reproduced in 6 McCarthy App. A5, at 43)(emphasis added); see also 77 Trademark Rep. at 461 (advocating that a mark"should be well known to a substantial portion of the relevant purchasers of the goods or services.")(emphasis added). This, I note, is a higher standard than the"appreciable number of persons" standard applied in an infringement action in which a plaintiff may prevail only if it shows that an appreciable number of ordinarily prudent purchasers of the type of product in question are likely to become confused as to the source of the goods by the defendant's use of the mark. See 77 Trademark Rep . at 461; 4 McCarthy S 24:92 at 24-163.

The crux of any discussion of Factor (F) is whether Times Mirror is likely to prove that its mark is recognized by a substantial portion of LVSN's potential consumers. Again, the FTDA does not quantify the requisite "degree of recognition". Consequently, some commentators have called for a clear percentage cut-off for consumer recognition. McCarthy, for example, recommends that a plaintiff 's mark must be known by more than 50% of the defendant's potential customers in order to be considered "famous". See 4 McCarthy S 24:92 at 24-164; see also Xuan-Thao N. Nguyen, The New Wild West: Measuring and Proving Fame and Dilution Under the Federal Trademark Dilution Act, 63 Albany L. Rev. 201, 233 (1999)(advocating a 40% rate of recognition among defendant's potential customers in a nationwide survey). While I am not wed to any specific minimum percentage for consumer recognition, I do take issue with the fact that Times Mirror has been granted a preliminary injunction without offering any evidence whatsoever of consumer recognition in LVSN's channel of trade.4

_____

4. The majority averts its gaze from what little evidence does exist relating to either party's channel of trade. The majority of LVSN copies

30

In the absence of evidence indicating that consumers in LVSN's channel of trade recognize Times Mirror's mark, it was wrong, in my view, for the District Court and the majority to conclude that the publications share a common market and that the mark is famous within that market. The Sporting News, moreover, is available at newsstands to members of the general public, just as Buick automobiles and Kodak film are available to the general public. Accordingly, to be entitled to a preliminary injunction, it was incumbent upon Times Mirror to demonstrate that it is likely to succeed in proving that its mark is truly famous among members of the general public and, although this should follow almost automatically, that its mark is recognized by a substantial portion of LVSN's consumers -- those who like to gamble, who read gambling publications, or who frequent casinos. Such a showing is typically achieved through a properly-conducted recognition survey.5

_____

(approximately 22,000 out of 42,000 in circulation) are made available at no charge in Nevada. Many others are available at no charge at casinos in Mississippi, Louisiana, Atlantic City, New Jersey and Foxwood, Connecticut. Only a small percentage of copies is sold at newsstands. Of the approximately 10,000 to 11,000 copies sent to a couple of hundred newsstands in a handful of states, only approximately 1,500 are actually sold; the rest are returned to the publisher. By contrast, The Sporting News is available nationwide through subscriptions and at newsstands.

In addition, the record does not evidence much if any overlap in advertising revenues or readership. Because LVSN is given away at casinos, it survives primarily on its advertising revenues. LVSN's advertisers tend to be "casinos, paging companies, [and] handicappers." Times Mirror, 1999 WL 124416, *2. The Sporting News, on the other hand, advertises, inter alia, sports memorabilia, collectibles, commemorative collections, apparel, sporting equipment, tobacco products and automobiles. LVSN's competitors for advertising dollars and readership are not sports magazines, but gambling publications, such as Gaming Today, Atlantic City Magazine and Casino Player. The Sporting News reports on the six major spectator sports; LVSN reports not only on sports gambling, but also on gambling on horse racing, car racing, roulette, craps, blackjack, slots -- and presidential elections.

5. See, e.g., Star Markets, Ltd. v. Texaco, Ltd., 950 F. Supp. 1030, 1033 & 1035 (D. Haw. 1996)(secondary meaning survey found 75% of respondents associated mark "Star" with plaintiff 's grocery stores; recognition survey found that over 96% of respondents recalled

31

Certainly, Times Mirror had ample time and notice (sixteen months passed between its discovery of LVSN's title and the preliminary injunction hearing) to conduct a recognition survey of its mark and/or a survey to determine whether its mark would be affected by the presence of LVSN's title in the marketplace.6

Assuming, arguendo, that a showing of fame only within the sports publication market suffices for protection under the FTDA, Congress's intent to reserve dilution protection for a select and narrow category of truly famous marks cannot be glossed over, as the majority has done, by an unsupported finding that "The Sporting News" mark is famous within its niche and recognized by a significant portion of Las Vegas Sporting News readers."A preliminary injunction may not be based on facts not presented at a hearing, or not presented through affidavits, deposition testimony, or other documents, about the particular situation [ ] of the moving part[y]." Adams v. Freedom Forge Corp., 204 F.3d 475, 487 (3d Cir. 2000). Times Mirror has simply not come forward with any evidence of "the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought." 15 U.S.C. S 1125(c)(1)(F). This failure weighs formidably against any conclusion that Times Mirror is likely to succeed on its dilution claim.

_____

plaintiff 's mark when asked to name any grocery store); Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. Of Travel Development, 955 F. Supp. 605, 612 n.4 (E.D. Va. 1997)(40% of respondents to recognition survey associated phrase"Greatest Show on Earth" with plaintiff 's circus), aff 'd, 170 F.3d 449 (4th Cir. 1999), cert.
denied, 120 S. Ct. 286 (1999); Hershey Foods Corp. v. Mars, Inc., 998 F. Supp. 500, 517 (M.D. Pa. 1998) (94% of respondents recognized orange, brown and yellow packaging of non-labeled peanut butter candy as Reese's brand).

6. Between 1997 and 1998, The Sporting News  spent $500,000 to study the market's perception of its title. See"In Brief: The More, The Merrier,"
Media Daily, Mar. 2, 1998. The results of this study were not, however, introduced into evidence.

B. The remaining factors

Examination of the remaining statutory factors underscores the inadequacy of the evidence offered by Times Mirror. Factor (A), the degree of inherent or acquired distinctiveness of the mark, encompasses more than simply whether "The Sporting News" mark has inherent distinctiveness or has acquired distinctiveness through secondary meaning, as it must to be eligible for protection under the Lanham Act. This factor suggests that the degree of the mark's distinctiveness is relevant to the fame inquiry. As discussed below with regard to Factor (G), the degree of a mark's distinctiveness is weakened by third party use of the mark and by the descriptive nature of the mark. Therefore, while this factor favors Times Mirror, it does so only slightly.

Factor (B), the duration and extent of the use of the mark, means more than simply the length of time "The Sporting News" mark has been in use, but also the breadth of its distribution. Times Mirror did not introduce evidence of The Sporting News's sales figures either in toto or broken down by source, i.e. newsstand, subscription, advertising, or Internet, relying only on its weekly circulation of half a million copies in Canada and the United States. It cannot be seriously argued that this weekly circulation is not small relative to other major publications, including sports magazines, and not small period given the population of those countries.7 Thus, despite over one hundred years of publication of an inexpensive product distributed in countries in which there is a huge interest in, and concomitant market for, anything to do with sports, the relatively limited extent of The Sporting News 's circulation certainly does not compel the conclusion that the mark has generated a mental association among consumers sufficient to support a finding of fame.

_____

7. See Bill Wallace, "Web Hits Becomes Baseball's New Statistic, Knight-Ridder Tribune Business News, Feb. 22, 2000, available at 2000 WL 14920170 (comparing distribution rates of sports publications -- 3.2 million weekly distribution of Sports Illustrated, for example -- and noting "second-tier" Sporting News's half million "static circulation" rate.)

Factor (C) addresses how widely and frequently a mark has been advertised or publicized which, in turn, suggests the public's familiarity with the mark. See 4 McCarthy S 24:92. Times Mirror presented evidence that it advertises primarily by direct mail, but also on television and "occasionally" on the radio in "selected markets". It did not, however, provide evidence of its annual advertising expenses, nor did it detail where, when, or how the mark has been advertised. Moreover, the unadorned fact that Times Mirror has an Internet website, a fact the majority noted, is of little significance because there is no evidence regarding the extent of sales or advertising on the Internet, nor is there any evidence regarding, for example, the number of "hits" received from visitors to the website which would assist in determining the degree of consumer recognition of the mark.8

The FTDA, I note, does not specify quantitative measurements for Factors (B) and (C), such as a basic minimum for sales or advertising. When, however, the evidence supporting these factors in this case is compared to that in dilution cases in which the mark has been deemed "famous", Times Mirror's evidence of sales revenue and advertising expenditures falls short.9

_____

8. The District Court's fame analysis appears to have added an additional factor to the eight statutory factors in emphasizing that "Times Mirror has spent millions of dollars improving the magazine." Times Mirror, 1999 WL 124416, *5. Large expenditures aimed at retooling a product do not contribute to establishing fame unless it can be shown that those efforts were effective among the relevant group of consumers. While it is possible that a company's investment in its product may result in the heightened fame of its mark, it is far from clear whether that has occurred here.

9. See, for example: Eli Lilly & Co. v. Natural Answers, Inc., ___ F. Supp. 2d ___, No. 99-1600, 2000 WL 223585, *2, 16 (S.D. Ind. Jan. 20, 2000)(finding "Prozac" famous; $12 billion in sales over twelve year period and "massive" unsolicited publicity rendering mark part of the "popular lexicon"); Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp., 80 F. Supp. 2d 815, 840 (N.D. Ill. 1999)(finding "Planet Hollywood" mark famous and noting annual sales of more than $195 million in merchandise bearing mark); NBA Properties v. Untertainment Records, L.L.C., No. 99-2933, 1999 WL 335147, *7 (S.D.N.Y. May 26,

34

Factor (G) clearly favors LVSN. Factor (G) takes into account the possibility that third party use of the mark or elements of the mark has already diluted the mark's strength, thereby rendering the mark less famous. See 77 Trademark Rep. at 461 ("Third party uses of the same or similar marks are relevant in determining the fame and distinctiveness of the mark, since the mark must be in substantially exclusive use. If a mark is in widespread use, it may not be famous for the goods or services of one business.").10

_____

1999)(finding NBA logo famous; logo appeared on $1.6 billion of merchandise over three year period and mark was widely promoted); Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208 (2d Cir. 1999) (finding Pepperidge Farm Goldfish crackers famous; $120 million three year marketing campaign and $200 million annual net sales); Ringling Bros., 955 F. Supp. at 609 (finding slogan "Greatest Show on Earth" famous; over $103 million in annual sales derived from goods bearing slogan and over $19 million in annual advertising expenditures); American Exp. Co. v. CFK, Inc., 947 F. Supp. 310, 312 (E.D. Mich. 1996)(finding slogan "Don't Leave Home Without It" famous; over $600 million in marketing expenditures over six years).

10. See, e.g., Avery Dennison Corp. v. Sumpton, 189 F.3d 868 (9th Cir. 1999); Carnival Corp. v. SeaEscape Casino Cruises, Inc., 74 F. Supp. 2d 1261, 1271 (S.D. Fla. 1999)("the word `fun' is used by many other businesses in the travel, gaming, and entertainment industries . . . cut[ting] against Carnival's dilution claim"); Michael Caruso & Co., Inc. v. Estefan Enterprises, Inc., 994 F. Supp. 1454, 1463 (S.D. Fla. 1998)(extensive third party use of word "bongo" undermines inherent distinctiveness of mark), aff 'd without opinion, 166 F.3d 353 (11th Cir. 1998); Hershey, 998 F. Supp. at 517 (finding trade dress not sufficiently famous and noting several examples of third party's trade dress in food industry similar to plaintiff 's color combination and lettering); Sports Authority v. Abercrombie & Fitch, Inc., 965 F. Supp. 925, 941 (E.D. Mich. 1997)(third-party use of "authority," whether or not in the relevant market, diminishes any distinctive or famous aspects of mark rendering it "not so famous as to deserve protection" under the FTDA); Trustees of Columbia University v. Columbia/HCA Healthcare Corp. , 964 F. Supp. 733, 744 & 750 (S.D.N.Y. 1997)(fame of mark "Columbia" for healthcare services "has been seriously undermined by third party use of the same or similar marks" both within the health care industry and in other industries); Star Markets, 950 F. Supp. at 1035 (noting multiple third party uses of "Star" and "Star Markets" in food industry and unrelated industries); Golden Bear Int'l, Inc. v. Bear U.S.A., Inc., 969 F. Supp. 742, 749 (N.D. Ga. 1996)(third parties extensively used both the word "bear" and a bear design in connection with the sale of sporting goods and clothes).

The words "sporting" and "news" are commonplace words in our vocabulary appearing on many items, not only publications. The majority does not acknowledge that at least six other publications use the word "sporting" in their titles: Grays Sporting Journal, Southern Sporting Journal, Sporting Thoughts, The Sporting Scene, The Sporting Life and Sporting Green. LVSN's use of the word"sporting" in its title describes the magazine's content. "Sporting" is defined, in this record, as "involving betting or gambling as sporting men. Involving or inducing the taking of risk as a sporting proposition." In Viacom, Inc. v. Ingram Enters., 141 F.3d 886 (8th Cir. 1998), the Eighth Circuit held that while the trademark "Blockbuster" for a chain of video stores was strong for purposes of an infringement analysis, the mark's strength was not necessarily sufficient to sustain a claim for dilution-by-blurring due to the ordinariness of the word "Blockbuster". See 141 F.3d at 891-92. The court noted that "the fact that Viacom is seeking a complete monopoly on the use of a rather common word with multiple meanings would make us hesitate to uphold summary judgment on its dilution-by-blurring claim." Id. (citing 3 McCarthy S 24:114 at 24-208) (dilution"is a potent legal tool, which must be carefully used as a scalpel, not a sledgehammer."). Third party use of the commonplace elements of Times Mirror's mark weakens its fame. Factor (G), therefore, strongly favors LVSN.

The legislative history indicates that the eight factors should be weighed independently "and it is the cumulative effect of these considerations which will determine whether a mark qualifies for federal protection from dilution." S. Rep. 100-515 (reproduced in 6 McCarthy App. A5, at 42). Moreover, the factors should be interpreted flexibly "so that their relative weight in any given case can be balanced." Hershey Foods Corp. v. Mars, Inc., 998 F. Supp. 500, 504 (M.D. Pa. 1998). In Hershey, for example, the District Court found that even though six of the eight enumerated statutory factors favored Hershey (inherent distinctiveness, degree of consumer recognition, duration and extent of use, advertising and publicity, geographical extent of trading area and widespread distribution channels), Hershey's trade dress was unlikely to meet the statute's stringent fame requirement because of third party use of the same

36

aspects of the trade dress and because it was not registered. Here, Factors (B), (D) and (H) favor Times Mirror because "The Sporting News" is a registered mark used continuously for over 100 years nationwide. However, there is little evidence going to Factor (B)'s extent of sales. Times Mirror has offered little or no evidence going to factors (C), (E) and (F). Factor (G) weighs strongly against Times Mirror. Finally, because third party use and the descriptive nature of the mark tend to weaken its distinctiveness, Factor (A) only slightly favors Times Mirror.

In my view, the District Court failed to sufficiently evaluate the mark -- it did not consider several of the statutory factors, nor did it qualitatively weigh those factors it did consider. Even if a mark not immediately recognizable by the general public can, nonetheless, meet the fame requirement of the FTDA, and I do not believe it can, at this preliminary stage, based upon the inadequate record before us, I cannot agree that Times Mirror is likely to succeed in proving the fame of its mark.11

_____

11. My disagreement with the majority rests primarily on my conclusion that Times Mirror has not come close to satisfying the threshold requirement of fame to qualify for protection under the FTDA. It goes without saying, therefore, that I would also disagree that Times Mirror was likely to prevail on its dilution claim. One observation: the majority holds that the District Court did not err in applying what have become known as the "Sweet factors" to determine whether LVSN's use blurred and, therefore, diluted, Times Mirror's mark for"The Sporting News". In addition to the Sweet factors, which have been roundly criticized, the majority appears to have adopted the multiple factor test articulated in Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208 (2d Cir. 1999), which includes the factor of likelihood of confusion, a factor which is required in a standard infringement analysis, but not in a dilution analysis. While I have no difficulty with adopting an appropriate list of factors for consideration, I note that we are the only Circuit to have considered the applicability of the Sweet factors -- and the Nabisco factors -- which has not articulated a specific critique or rejected some or all of the factors.
We should do so as well.

The majority also holds that the District Court did not err in finding that irreparable injury may be shown even in the absence of actual economic harm, presumably siding with the Second Circuit and rejecting the Fourth Circuit's position on the issue. Compare Ringling Bros.-

37

III.

Conclusion

The FTDA grants broad discretion to the federal courts and, as one commentator has remarked, "it is up to the judiciary to apply such potent laws with care and common sense lest they damage the competitive systems they are designed to enhance." 4 McCarthy S 24:114 at 24-222. Lax interpretation of FTDA requirements forecasts easier lawsuits for trademark owners who will use a dilution cause of action as a "tack-on" to an infringement claim in the event that likelihood of confusion cannot be shown, and even when, as perhaps here, it can. See Klieger, Trademark Dilution, 58 U. Pitt. L. Rev. at 64 ("It may just be a matter of time before dilution eclipses confusion as the gravamen of most federal trademark actions and trademark rights in gross displace consumer protection as the defining feature of United States Trademark law."); I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 48 (1st Cir. 1998)("Dilution laws are intended to address specific harms; they are not intended to serve as mere fallback protection for trademark owners unable to prove trademark infringement.").

Naturally, when a court rules on a motion for a preliminary injunction, it makes an initial judgment based on an incomplete factual record; its findings of fact and conclusions of law are subject to revision based on additional discovery. The stakes are, nonetheless, high; here, for example, had the injunction not been stayed with the consent of the parties, lowering the bar for the fame

_____

Barnum & Bailey Combined Shows, Inc. v. Utah Div. Of Travel Development, 170 F.3d 449, 461 (4th Cir. 1999), cert. denied, 120 S. Ct. 286 (1999), with Nabisco, 191 F.3d at 223-24. I agree, and note only that it would be well-nigh impossible for a widely sold product such as Kodak to show that its sales have been impacted by a diluting use of its mark. Indeed, Kodak's sales might well be increasing even as the distinctiveness of its truly famous mark is being whittled away by an unauthorized user. See S. Rep. No. 100-515, at 108 (noting that distinctive quality of a mark "could be materially reduced during a period of rising sales").

requirement would have forced LVSN to alter its publication at great cost or cease publishing altogether.12

Yet again, we have recently stressed our respect for the extraordinary nature of the preliminary injunction power and the fact that "the use of judicial power to arrange relationships prior to a full determination on the merits is a weighty matter" to be reserved for extraordinary situations. Adams v. Freedom Forge Corp., 204 F.3d 475, 487 (3d Cir. 2000). This is surely not such a situation. I would vacate the preliminary injunction.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

_____

12. A District Court's review of the merits of a dilution claim at the preliminary injunction stage may also be significant because, as at least one court has held, the cause of action is essentially equitable in nature and may not provide a right to a jury trial. See Ringling Bros., 955 F. Supp. 598, 605 (E.D. Va. 1997), aff 'd on other grounds, 170 F.3d 449 (4th Cir. 1999)(reserving constitutional issue for another day), cert. denied, 120 S. Ct. 286 (1999); see also 25 U.S.C. SS 1116(a), 1117(a), 1118; 2 Gilson S 5.12[1][c][vii].