**POCONO INTERNATIONAL RACE-WAY, INC., d/b/a Pocono Race-way, Plaintiff,**

v.

**POCONO MOUNTAIN SPEEDWAY, INC., and Barry Callavini, Defendants.**

No. CIV.A. 3:00–0287.

United States District Court, M.D. Pennsylvania.

Aug. 13, 2001.

Alan R. Boynton, Jr., McNees, Wallace & Nurick, Harrisburg, PA, Mitchell Alan Smolow, McNees, Wallace & Nurick, Hazleton, PA, for plaintiff.

David L. Glassberg, Hazleton, PA, Allan J. Jacobson, Langhorne, PA, for defendants.

### MEMORANDUM AND ORDER

KOSIK, District Judge.

This action arises under the common law, 15 U.S.C. §§ 1114, 1125(a), 1125(c) (Lanham Act), the Anticybersquatting Consumer Protection Act, Public Law 106–113, codified at 15 U.S.C. § 1125(d), and the Pennsylvania Antidilution Law, 54 Pa.C.S.A. § 1124. This court has jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338 and 1367. Venue in this court is proper under 28 U.S.C. § 1391. On February 15, 2000, plaintiff, Pocono International Raceway (hereinafter Pocono Raceway), filed a complaint [1] alleging infringement and dilution of their registered trademark (708 design), and unregistered trademarks (text of "Pocono Raceway" [2] and "Pocono") by defendants, Pocono Mountain Speedway (hereinafter

---

1. Plaintiff actually filed an amended complaint on June 26, 2000, which recharacterized its claims to include the textual marks "Pocono Raceway" and "Pocono."

2. Plaintiff's textual mark, "Pocono Raceway", was registered subsequent to the filing of the complaint on March 27, 2001.

Pocono Speedway) and Barry Callavini.[3] Parties have agreed to separate trials on the issues of liability and damages. A one day non-jury civil trial to determine issues of liability was conducted on June 5, 2001. Pursuant to Fed.R.Civ.P. 52(a) we make the following findings of fact: [4]

1. Pocono Raceway is a provider of entertainment services, namely, providing facilities for auto and other motor vehicle racing competitions.

2. Pocono Raceway is the owner of U.S. Trademark Registration No. 1,609,708 for POCONO RACEWAY and Design (the "708 Registration") dated August 14, 1990 for:

    (a) Entertainment services, namely, providing facilities for auto and other motor vehicle racing competitions;

    (b) Clothing, namely, T-shirts, sweatshirts, jackets, hats, and caps;

    (c) Patches for clothing;

    (d) Printed matter in the form of programs, posters, and decals; and

    (e) Ornamental lapel pins.

3. Pocono Mountain Speedway is also a provider of entertainment services, namely, providing facilities for auto and other motor vehicle racing competitions.

4. Pocono Mountain Speedway is located forty-three (43) miles from Pocono Raceway.

5. Pocono Mountain Speedway has been in operation since October 1, 1999.

6. Pocono Mountain Speedway has printed its name on programs, tickets and fliers to be distributed to the public.

7. Pocono Mountain Speedway has printed its name in print advertising.

8. Pocono Mountain Speedway has advertised its name and established information booths at trade shows specific to the auto racing industry.

9. Pocono Mountain Speedway had a female attend a trade show specific to the auto racing industry wearing a sash labeled "Miss Pocono Mt. Speedway".

10. Pocono Mountain Speedway operates a web site with the domain name "www.poconomountainspeedway.com".

11. On November 8, 1999, counsel for Pocono Raceway sent a letter to Pocono Mountain Speedway requesting that Pocono Mountain Speedway abandon the use of the names "Pocono" and "Speedway" together.

12. Pocono Mountain Speedway is a Pennsylvania Corporation.

13. Pocono Mountain Speedway's web site features advertisement, rules, and event listings, none of which are in any way sponsored by or connected to Pocono Raceway.

14. Pocono Raceway is the owner of the 708 registration

15. The 708 registration is incontestable.

16. The 708 registration is valid and legally protectable.

---

**3.** Plaintiff's complaint alleges identical claims against both defendant Pocono Mountain Speedway and defendant Barry Callavini. Because it was established at trial that defendant Callavini held no position with defendant Pocono Mountain Speedway, *see* Transcript at 18–19, counts II, IV, VI, VIII, and X will be dismissed as to defendant Callavini. However, because he acted as registrant for Pocono Mountain Speedway's web site, count XI will remain and be addressed below.

**4.** The parties have stipulated to findings of fact, 1–13. *See* Transcript at 4; *see also* Docs. 30 at 3, and 31 at 4. Pursuant to Rule 52(a), we make the additional findings of fact, 14–49.

17. Plaintiff's 708 mark and defendant's logo mark are dissimilar in sight and sound.

18. Plaintiff has spent large sums of money to advertise its facility and services using the 708 mark.

19. Plaintiff's 708 mark appears on its web site.

20. Plaintiff's advertising efforts utilizing the 708 mark have resulted in public recognition.

21. Plaintiff's sales have generally increased over the last twenty-two (22) years.

22. Plaintiff's 708 mark possesses somewhere between strong and weak distinctiveness and/or conceptual strength.

23. Tickets to an event at plaintiff's facility range in price from $10 to $375.

24. Both sophisticated and unsophisticated consumers purchase tickets to events held at plaintiff's facility.

25. Defendant displayed no intent to confuse consumers through use of defendant's logo mark.

26. Plaintiff and defendant market their goods and services through the same channels of trade and through the same media.

27. Plaintiff and defendant target the same consumers.

28. Plaintiff and defendant provide nearly identical goods and/or services in the mind of the average consumer.

29. Pocono Raceway is the owner of the textual mark, "Pocono Raceway".

30. Pocono Raceway is the owner of the textual mark, "Pocono".

31. Plaintiff has spent in excess of $5,000,000.00 in hard currency and $10,000,000.00 in collateral currency on advertising since the company's inception.

32. Plaintiff's advertising utilized the textual marks "Pocono Raceway" and "Pocono".

33. Plaintiff has utilized the textual marks "Pocono Raceway" and "Pocono" since 1968 and 1972 respectively.

34. Plaintiff is the exclusive user of the textual marks "Pocono Raceway" and "Pocono" in the realm of automobile racing.

35. Plaintiff's textual marks have been used extensively in trade journals and other publications.

36. Plaintiff is a large corporation with a national consumer base.

37. As many as 150,000 spectators attend each of the two main events held at plaintiff's facility.

38. As many as 3 to 4 million spectators watch on television each of the two main events held at plaintiff's facility

39. Several incidents of actual confusion among consumers as to plaintiff's and defendant's respective goods and services occurred within the first year of defendant's operations.

40. The "Pocono Raceway" and "Pocono" marks have attained secondary meaning.

41. The "Pocono Raceway" and "Pocono" marks are valid and legally protectable.

42. Plaintiff's textual marks, "Pocono Raceway" and "Pocono" are very similar in sight and sound to defendant's textual mark "Pocono Mountain Speedway".

43. Plaintiff's textual marks have a mark strength somewhere between strong and weak.

44. Defendant has displayed no intent to confuse consumers through adoption of its textual mark "Pocono Mountain Speedway".

45. Pocono Mountain Speedway's use of the "Pocono Mountain Speedway" textual mark to identify goods and/or services is

likely to create confusion concerning the origin of the goods and/or services.

46. The "Pocono Raceway" and "Pocono" marks are famous.

47. Pocono Mountain Speedway is making commercial use of its "Pocono Mountain Speedway" textual mark in interstate commerce.

48. Pocono Mountain Speedway began its use of its "Pocono Mountain Speedway" mark after Pocono Raceway's textual marks became famous.

49. Pocono Mountain Speedway's use of its "Pocono Mountain Speedway" mark dilutes Pocono Raceway's textual marks by lessening the capacity of Pocono Raceway's textual marks to identify and distinguish goods and/or services.

## DISCUSSION

"The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Fisons Horticulture, Inc., v. Vigoro Industries, Inc.,* 30 F.3d 466, 472 (3d Cir.1994)(quoting *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983)). Trademark infringement claims under section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and federal unfair competition claims under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), are measured by identical standards. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 210 (3d Cir.2000). Section 32(1) of the Act protects registered trademarks, while section 43(a) of the Act protects unregistered trademarks. To succeed on the merits of plaintiff's trademark infringement cause of action or its federal unfair competition cause of action, plaintiff must show by a preponderance of the evidence that (1) the marks in question are valid and legally protectable, (2) they are owned by plaintiff, and (3) that the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services. *Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.,* 214 F.3d 432, 437 (3d Cir.2000); *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 472 (3d Cir.1994); *Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 192 (3d Cir.1990).

The first two requirements, validity/legal protectability and ownership, are automatically proven when a mark is federally registered and has become "incontestable" under the Lanham Act. *See* 15 U.S.C. §§ 1065 and 1115. However, the statute provides certain defenses to the validity of an incontestable mark. *See* 15 U.S.C. § 1115(b). Proof of one of these defenses rebuts the conclusive presumption that the mark is protected, and registration, then, "constitutes only prima facie and not conclusive evidence of the owner's right to exclusive use of the mark." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 200 n. 6, 105 S.Ct. 658, 664 n. 6, 83 L.Ed.2d 582 (1985). Among these enumerated defenses is that of "fair use." *Id.* To prove the affirmative defense of fair use in a trademark infringement action, defendant must establish that it is not using the relevant term as a trademark or service mark, that the term is descriptive of goods or services of defendant, and that such use is fair and made in good faith. *Institute for Scientific Information, Inc. v. Gordon and Breach, Science Publishers, Inc.,* 931 F.2d 1002, 1008 (3d Cir.1991). Once a defendant provides sufficient evidence to support one of the listed defenses, the plaintiff's mark will only be protected if through usage the mark has become distinctive or has obtained "secondary meaning." *See Ford Motor Co. v. Summit Motor Prods.,* 930 F.2d 277, 292 (3d Cir.

1991); J Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 14:1 at 620 [hereinafter McCarthy].

Where a mark has not been federally registered or, if registered, has not become incontestable, the plaintiff may establish validity by showing either that the mark is inherently distinctive, or that it has attained secondary meaning in the mind of the consuming public. *Ford,* 930 F.2d at 291; *see also Commerce,* 214 F.3d at 438. With respect to ownership of an unregistered mark, the first party to begin making continuous commercial use of a mark may assert ownership rights in the mark. *Ford,* 930 F.2d at 292.

Plaintiff must establish that its mark held secondary meaning at the time and place that the defendant began use of the mark. *See Commerce,* 214 F.3d at 438; *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir.1978); McCarthy, § 15:4. A geographically descriptive mark will be protected in a market in which the mark has acquired a secondary meaning.

"Secondary meaning exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin." *Scott,* 589 F.2d at 1228; *Commerce,* 214 F.3d at 438. Secondary meaning is generally "established through extensive advertising which creates in the minds of consumers an association between the mark and the provider of the services advertised under the mark." *Commerce,* 214 F.3d at 438. In *Commerce,* the Court of Appeals provided a non-exclusive list of factors which a district court could consider. These factors were the following: (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion. *Id.*

In addition to proving validity and ownership, "a plaintiff must also prove likelihood of confusion, which is said to exist 'when the consumers viewing the defendant's mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" *Ford,* 930 F.2d at 292 (quoting *Scott,* 589 F.2d at 1229). In its recent opinion in *A & H Sportswear, Inc. v. Victoria's Secret Stores,* 237 F.3d 198 (3d Cir.2000), the Court of Appeals stated that a "district court should not be foreclosed from using any factors that it deems helpful in analyzing whether a likelihood of confusion exists between given products, whether or not they directly compete." *A & H,* 237 F.3d at 212. The Court went on to state that the ten factors considered for non-competing goods (known as *Lapp* factors) should be used for both competing and non-competing goods. *Id.* at 213. These ten factors are the following: (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers, whether because of

the near-identity of the products, the similarity of function, or other factors; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market. *Id.* at 215.

*Plaintiff's 708 Design*

■ In regards to plaintiff's 708 design, there is no dispute that plaintiff is the owner of a valid and legally protectable mark because that mark was federally registered and has become incontestable. *See* Doc. 12, Ex. A; *see also* 15 U.S.C. §§ 1065 and 1115. Thus, in order to succeed on a claim of trademark infringement for this particular mark, plaintiff must show that defendant has used a mark that is likely to cause confusion.[5]

A likelihood of confusion is said to exist " 'when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.' " *Ford,* 930 F.2d at 292 (quoting *Scott,* 589 F.2d at 1229). Prior to the Third Circuit Court of Appeals' recent decision in *A & H Sportswear v. Victoria's Secret Stores,* 237 F.3d 198 (3d Cir.2000), the Court had stated that a district court "need rarely look beyond the mark itself" when addressing a

trademark infringement claim brought against an alleged infringer who deals in competing good or services. *See Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 461 (3d Cir.1983); *see also A & H Sportswear v. Victoria's Secret Stores,* 166. F.3d 197, 202 (3d Cir.1999); *Fisons,* 30 F.3d at 472; *Opticians,* 920 F.2d at 195. However, in the Court's most recent decision in *A & H,* 237 F.3d 198 (3d Cir.2000), the Court stated that "whether or not the goods directly compete, the *Lapp* factors should be employed to test for likelihood of confusion." *A & H,* 237 F.3d at 215. Therefore, we will apply the *Lapp* factors in deciding whether defendant has used a mark confusingly similar to plaintiff's 708 mark.

*Lapp Factors:*

*1. Degree of similarity between the owner's mark and the alleged infringing mark.*

In *A & H,* the Court stated that the "single most important factor in determining likelihood of confusion is mark similarity." *A & H,* 237 F.3d at 216 (citing *Fisons,* 30 F.3d at 476). The Court went on to emphasize the importance of analyzing the two marks separately, rather than side-by-side. *Id.* We, therefore, must look at these two marks separately and determine whether these two marks would "create the same overall impression" to an "ordinary consumer." *Id.*

**5.** Incontestable status of a mark and the presumption of validity and ownership which that status provides a mark can be rebutted by the defense of fair use. *See* 15 U.S.C. § 1115(b). However, because we conclude

below that there is no likelihood of confusion attributable to defendant's use of its logo mark as to plaintiff's 708 mark, we will not address defendant's argument of fair use in this regard.

Plaintiff's 708 mark contains the words "Pocono Raceway" inside a triangle with rounded edges. Defendant's mark includes the words "Pocono Mountain Speedway" written in a different type font and surrounded by dissimilar graphics. Although both of these marks include the word "Pocono", we believe the marks' obvious dissimilarities, i.e., different actual words and different fonts and graphics, are unlikely to leave a consumer with the same overall impression. We, therefore, conclude that this factor, "the most important factor in determining likelihood of confusion," weighs in favor of defendant.

### 2. The strength of the owner's mark.

■ We turn next to the strength of the 708 mark. The strength of a mark is often measured by "(1) the distinctiveness or conceptual strength of the mark and (2) the commercial strength of marketplace recognition of the mark. The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of 'marketplace recognition.'" *A & H*, 237 F.3d at 221 (citations omitted). Considering the first prong of this test, we find plaintiff's 708 mark to possess somewhere between strong and weak distinctiveness and/or conceptual strength.

Conceptual strength of a mark is "often associated with the particular category of 'distinctiveness' into which a mark falls (i.e., arbitrary, suggestive, or descriptive)..." *A & H*, 237 F.3d at 222. However, the category into which the mark falls "is not the only measure of conceptual strength ... The classification of a mark as arbitrary, suggestive, or descriptive is only secondarily used to determine the degree of protection a mark should receive once protectability has been established." *Id.* A registered mark, such as plaintiff's 708 mark, is already presumptively protectable. However, the degree to which it is protected, in particular, as to defendant's mark, is determined by considering the likelihood of confusion with the defendant's mark.

As argued by both parties, we must view this mark in its entirety without separating it into its components. As such, we must not look only at the words contained in the mark, but rather the entire mark of which the actual words are only a part. As described above, plaintiff's 708 mark is a tri-oval surrounding the words "Pocono Raceway." The tri-oval surrounding the text apparently represents the shape of the racetrack at Pocono Raceway. Further, the individual words "Pocono" and "Raceway" describe the location of the racetrack and the service provided, respectively. As such, we find this mark viewed in its entirety to be descriptive.[6]

6. As recognized by the Court of Appeals, "the classification of a mark as 'descriptive' or 'arbitrary' for the purpose of determining whether it received trademark protection at all...is not dispositive." *A & H*, 237 F.3d at

222. We reiterate that at this point in our analysis, we look to the classification of plaintiff's 708 mark not to determine whether it is protectable (the 708 mark is presumptively

Turning to the second prong of the test, we find that plaintiff's mark has a high level of commercial strength. Plaintiff's 708 mark has been used extensively by plaintiff for several years to identify plaintiff's facility and services. Plaintiff has clearly spent large sums of money to advertise its facility and services using the 708 mark.[7] *See* Transcript at 8–18. Plaintiff's 708 mark appears on their web site at *www.poconoraceway.com.* Undoubtedly, plaintiff's efforts in advertising utilizing the 708 mark has resulted in public recognition. *Cf., A & H,* 237 F.3d at 224 (finding reasonable district court's conclusion that money spent on advertising "undoubtedly resulted in increased public recognition"). Sales have generally increased over the last 22 years. *See* Transcript at 84. In consideration of this evidence, we conclude that the commercial strength inquiry weighs in favor of plaintiff, and the combination of these two inquiries (conceptual and commercial strength) results in a mark strength somewhere between strong and weak.

*3. The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase.*

In considering this third *Lapp* factor, the Court has noted that it is the "functional equivalent" of "sophistication of consumers." *A & H,* 237 F.3d at 225. Plaintiff's witness, Mr. Pallo, testified that the price of a ticket to an event at Pocono Raceway ranges from $10 to $375. *See* Transcript at 56. We find that this broad range in price of tickets suggests that the "sophistication of consumers" would also span a broad range. As such, we find it more than likely that both sophisticated and unsophisticated consumers would purchase these tickets.

*4. The length of time the defendant has used the mark without evidence of actual confusion arising.*

Defendant began operation of its facility under the name "Pocono Mountain Speedway" on or about October 1, 1999. Although it is unclear when defendant began using its logo mark, it appears defendant began use of it sometime in 1999. Plaintiff has offered evidence of several occasions when consumers mistook plaintiff for defendant. However, there is no indication/evidence that this actual confusion resulted from use of defendant's logo mark, as opposed to the text, i.e., the actual words "Pocono Mountain Speedway." We will reconsider this evidence of actual confusion below when we consider the textual marks "Pocono" and "Pocono Raceway." This factor, therefore, weighs in favor of defendant.

*5. The intent of the defendant in adopting the mark.*

In *A & H,* the Court of Appeals clarified the purpose of this intent inquiry. The Court stated the following: "Intent is relevant to the extent that it bears on the likelihood of confusion. We have held that a defendant's mere intent to copy, without more, is not sufficiently probative of the defendant's success in causing confusion to weigh such a finding in the plaintiff's favor; rather, defendant's intent will indicate a likelihood of confusion only if an intent to confuse consumers is demonstrat-

protectable because it is a registered mark), but rather to determine the mark's strength.

**7.** Although it is unclear from the testimony exactly how much of the millions of dollars spent on advertising was spent using the 708 registration alone, as opposed to the individu-

al textual marks "Pocono" and "Pocono Raceway", it is clear from the many admitted exhibits that large amounts of money were spent on advertising using the 708 registration. *See, e.g.,* Plaintiff's Exhibits 2, 5, 6, 7, 26, 58, and 61.

ed via purposeful manipulation of the junior mark to resemble the senior's." *Id.* at 226 (citing *Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.,* 50 F.3d 189, 205–06 (3d Cir.1995)).

In light of our conclusion that there is little similarity between plaintiff's 708 mark and defendant's logo mark, we find no evidence of intent to confuse consumers through use of defendant's logo mark.

### 6. Evidence of actual confusion.

Although plaintiff offered evidence of several occasions when consumers mistook plaintiff as defendant, this "actual confusion" seems to stem from plaintiff's other contested marks, i.e., textual marks, "Pocono", and "Pocono Raceway." As such, these incidents of "actual confusion" will be considered below within our analysis of plaintiff's textual marks. As to plaintiff's 708 mark, this factor, therefore, weighs in favor of defendant.

### 7. Whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media.

Plaintiff and defendant both market their goods and services through the same channels of trade and through the same media. Plaintiff submitted extensive evidence of money spent on advertising through various media, including television and print. As indicated above, some of this advertising included use of plaintiff's 708 logo. Defendant has also utilized print in its advertising efforts. Plaintiff also offered testimony indicating that both plaintiff and defendant were represented at common trade shows specific to the auto racing industry. *See* Transcript at 44. We, therefore, conclude that plaintiff and defendant market their goods and services through the same channels of trade and the same media.

### 8. The extent to which the targets of the parties' sales efforts are the same.

Clearly, the target of the parties' sales efforts is the racing fan. Plaintiff contends that a race fan is a race fan, and thus, the same fans who patronize defendant's facility would also patronize plaintiff's facility. *See* Transcript at 60. Defendant, on the other hand, argues that although the target for both parties is race fans, each party is targeting a particular type of race fan.

Defense witness Joseph Callavini (owner of defendant Pocono Mountain Speedway) testified that the two racetrack facilities involved in this dispute appeal to different consumers. *See* Transcript at 109–111. In his opinion, there is no crossover of fans who attend events at Pocono Raceway and Pocono Mountain Speedway. *Id.* In support of this opinion, Mr. Callavini testified that the two facilities hold racing events for different types of cars. *Id.* at 100–01. Defendant's events are for NASCAR modifieds, or open-wheeled cars. *Id.* Plaintiff's facility, on the other hand, no longer holds events for open-wheeled cars. *Id.* Mr. Callavini also testified that defendant's facility is a "short track racetrack" unlike plaintiff's facility. *Id.* at 109. Further, Mr. Callavini testified that defendant holds events on Saturday nights while plaintiff holds events on Sundays. *Id.*

Despite Mr. Callavini's assertion to the contrary, we find it more credible that there is at least some crossover of fans/consumers between plaintiff's events and defendant's events. As such, the two parties would target the same consumers.

### 9. The relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors.

As described above, both plaintiff and defendant are in the business of providing racing facilities for racing fans. However,

also as indicated above, defendant would argue that the service and/or goods that it provides differs from that of plaintiff in that defendant's facility holds a different type of event than does plaintiff's facility. However, like our conclusion above, we find it more credible that these two facilities provide, to the average consumer, nearly identical goods and services, i.e., racing facilities.

*10. Other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendants' market, or expect that the prior owner is likely to expand into the defendants' market.*

As no relevant evidence falling outside the scope of the first nine factors was introduced, we will not give this final *Lapp* factor any consideration.

*Conclusion*

In consideration of the above ten (10) *Lapp* factors as they apply to plaintiff's 708 mark, we find there exists no likelihood of confusion by consumers of plaintiff's 708 mark and defendant's logo mark. In coming to this determination, we place great weight in our conclusion that the two marks in question were sufficiently dissimilar to an average consumer to ensure that the average consumer would not mistake one for the other. As indicated by the Court of Appeals in *A & H*, "the single most important factor in determining likelihood of confusion is mark similarity." *A & H*, 237 F.3d at 216. When viewed in their entirety and apart from one another as they would be in the marketplace, these two logo marks in question would not leave the average consumer with the "same overall impression." This conclusion in combination with the other *Lapp* factors

which weighed in favor of defendant leads us to the overall conclusion that there exists no likelihood of confusion as to plaintiff's 708 mark.

*Plaintiff's textual marks, "Pocono Raceway" and "Pocono."*

We turn next to plaintiff's unfair competition claims as pertaining to the textual marks "Pocono Raceway" and "Pocono." At the time plaintiff's complaint was filed, both of these textual marks were unregistered. However, prior to trial of this matter, plaintiff obtained registration of the textual mark "Pocono Raceway." *See* Pltf. Ex. 82. However, because it has not obtained "incontestable" status pursuant to 15 U.S.C. § 1065, this mark is not entitled to the conclusive presumption of validity and ownership provided by 15 U.S.C. § 1115.[8] Further, because this textual mark is not incontestable, plaintiff can only establish its validity/protectability by showing either that the mark is inherently distinctive, or that it has attained secondary meaning in the mind of the consuming public. *See Ford*, 930 F.2d at 291; *see also Commerce*, 214 F.3d at 438. This same showing must be made by plaintiff as to their unregistered textual mark "Pocono." Plaintiff does not argue, nor do we believe it could reasonably do so, that these textual marks are inherently distinctive. Rather, plaintiff focuses its argument in this regard on these textual marks' secondary meaning.

As detailed above, secondary meaning "exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin." *Scott*, 589 F.2d at 1228; *Commerce*, 214 F.3d at 438. The Court of Appeals has provided a non-exclusive list of factors

---

**8.** Defendant does not contest plaintiff's ownership of these two textual marks as plaintiff

is clearly the senior user of these marks. *See Ford*, 930 F.2d at 292.

which a district court may consider in making this determination. We consider these factors below.

*Secondary Meaning Analysis*

### 1. The extent of sales and advertising leading to buyer association.

Plaintiff presented testimony that plaintiff has engaged in extensive advertising campaigns since the company began operation around 1968. Witness Robert Pleban specifically testified that Pocono Raceway has spent in excess of $5,000,000.00 in hard currency and $10,000,000.00 in collateral currency on advertising since the company's inception. *See* Transcript at 9. This extensive advertising campaign utilized the specific textual marks "Pocono Raceway" and "Pocono" and occurred in the time prior to the filing of this action. *Id.* at 8.

### 2. Length of use.

Plaintiff's witness, Mr. Pleban, testified that plaintiff has utilized the textual marks "Pocono Raceway" and "Pocono" for as long as he could remember. *Id.* at 9. He further testified that he has worked for plaintiff for sixteen (16) or seventeen (17) years. *Id.* at 9 and 11. Witness Robert Pallo, Vice President, General Sales Manager at Pocono Raceway, testified that Pocono Raceway has called itself "Pocono Raceway" since 1968. *Id.* at 32. He also testified that Pocono Raceway has gone by the name of "Pocono" since at least 1972. *Id.*

### 3. Exclusivity of use.

Plaintiff argues that it is the exclusive user of the marks "Pocono Raceway" and "Pocono." Defendant, on the other hand, argues that there exist many other users of the "Pocono" mark and point to various listings in local telephone books which contain the word "Pocono" in their names. *See* Transcript at 120–121; *see also* Defen-

dants' Exhibit 6. However, as explored during the testimony of witness Dr. Mattioli, these other listings utilizing the word "Pocono" in their names were not in any way affiliated with racing facilities. *Id.* It was also developed during the testimony of witnesses Mr. Pallo and Dr. Mattioli that on numerous occasions, Pocono Raceway contacted other racetracks which it felt were infringing on their textual marks. *Id.* at 33, 90–93, 130–131. We conclude that plaintiff is the exclusive user of the textual marks "Pocono Raceway" and "Pocono" in the context of automobile racing.

### 4. The fact of copying.

Similarly to the Court in *Commerce*, 214 F.3d 432, 440, we find this factor minimally probative of whether plaintiff has established secondary meaning in the textual marks "Pocono Raceway" and/or "Pocono." The fact that defendant has used the word "Pocono" in its name does not alone suggest the "fact of copying." As described above, the words "Pocono" and "Raceway" are not particularly distinctive, but are merely descriptive. As such, the existence of the words "Pocono" and "Speedway" in defendant's name does not suggest the "fact of copying."

### 5. Customer surveys.

When asked during cross-examination, plaintiff's witness, Robert Pallo, indicated that plaintiff had not conducted any surveys as to how plaintiff is perceived by consumers. *See* Transcript at 85–86.

### 6. Customer testimony.

Although neither party called any "customers" to testify, during the cross examination of defendant Barry Callavini, he indicated that he was a racing fan. *See* Transcript at 28. When asked by plaintiff's counsel "if I were to say to you in two weeks, they're racing at Pocono, you would

know that they're racing at Pocono Raceway, correct?", he answered, "Yes, because I follow the NASCAR schedule. I know the dates." *Id.*

### 7. Use of the mark in trade journals.

Plaintiff introduced into evidence several publications, including trade journals, which referred to plaintiff as either "Pocono" or "Pocono Raceway." *See* plaintiff's exhibits, 12–19, 31, 41 and 58; *see also* Transcript at 62–66. We find the many references to plaintiff as either "Pocono" or "Pocono Raceway" in various publications to be indicative and highly suggestive of the existence of secondary meaning of those textual terms.

### 8. The size of the company.

The evidence introduced by plaintiff pertaining to advertising expenditures and sales indicates that plaintiff is a large corporation with a national consumer base.

### 9. The number of sales.

Plaintiff's witnesses indicated that during plaintiff's two annual Winston Cup events, Pocono 500 and Pennsylvania 500, the number of attendees/consumers at times exceeds 150,000. *Id.* at 36. Mr. Pallo also indicated that as many as 3 to 4 million spectators watch each of these events on television. *Id.* at 56. Plaintiff's witness also testified that sales have consistently increased since the corporation's inception. *Id.* at 84. We find that these sales figures and profits figures are indicative of an enormous number of sales since plaintiff's inception.[9]

### 10. The number of customers.

Plaintiff's witness, Mr. Pallo, testified that plaintiff's advertising campaigns were national in scope. As noted above, he indicated that during plaintiff's two annual Winston Cup events, the number of attendees/consumers at times exceeds 150,000. *Id.* at 36.

### 11. Actual confusion.

Plaintiff's witness, Robert Pallo, testified to multiple incidents of actual confusion among consumers as to plaintiff's and defendant's respective goods and/or services. Two of these incidents occurred during a major motor sports trade show in Fort Washington, Pennsylvania. The first occurred when a page went over the communications system for a man to report to the "Pocono" booth. This man reported to plaintiff's booth, but then realized he was supposed to report to defendant's booth. *Id.* at 44–45. The second incident occurred when some male race fans approached plaintiff's booth and asked whether Miss Pocono was available that day for autographs and photographs. Mr. Pallo testified that he told these male fans that Miss Pocono was not affiliated with plaintiff but rather with defendant, and he directed them to defendant's booth. *Id.* at 45.

Plaintiff's witness, Mr. Pleban, testified that on at least three occasions, a local newspaper, the Hazleton Standard Speaker, sent "tear sheets" to plaintiff which should have been sent to defendant. *Id.* at 12–14. Mr. Pallo testified that on one occasion, plaintiff received a fax from the Ramada Inn in Hazleton that was intended for defendant. *Id.* at 76–77.

### Secondary Meaning Conclusion

Having considered the above non-exclusive and non-exhaustive list of factors for secondary meaning, we find the textual marks, "Pocono Raceway" and "Pocono"

---

**9.** During the trial, plaintiff's attorney moved to have plaintiff's profit figures sealed. We granted this motion, and thus, do not reveal these figures here.

to have obtained secondary meaning. Thus, in order for plaintiff to succeed on their trademark infringement claim and/or unfair competition claim as to their two textual marks, plaintiff must show that defendant's use of these textual marks to identify their goods and/or services is likely to create confusion concerning the origin of the goods and/or services. *See Commerce*, 214 F.3d at 437; *Fisons*, 30 F.3d at 472; *Opticians*, 920 F.2d at 192. We, therefore, apply the *Lapp* factors to plaintiff's two textual marks.

*Likelihood of Confusion Analysis*

*1. Degree of similarity between the owner's mark and the alleged infringing mark.*

██ As we indicated above, the Court of Appeals opined in *A & H* that the "single most important factor in determining likelihood of confusion is mark similarity." *A & H*, 237 F.3d at 216 (citing *Fisons*, 30 F.3d at 476). They also stressed the importance of viewing the two marks separately, as a consumer would view them. *Id.* We must, therefore, look at these textual marks separately and determine whether they would "create the same overall impression" to an "ordinary consumer." *Id.*

Plaintiff's textual marks are "Pocono Raceway" and "Pocono." Defendant's mark is "Pocono Mountain Speedway." We find that the site and sound of these textual marks viewed separately are nearly identical. Thus, we find that these textual marks would leave the ordinary consumer with the same overall impression.

*2. The strength of the owner's mark.*

We turn next to the strength of plaintiff's textual marks. As described above, the strength of a mark is often measured by "(1) the distinctiveness or conceptual strength of the mark and (2) the commercial strength of marketplace recognition of the mark. The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of 'marketplace recognition.'" *A & H*, 237 F.3d at 221 (citations omitted).

Considering the first prong of this test, we find plaintiff's textual marks to have somewhere between a strong and weak distinctiveness and/or conceptual strength. Conceptual strength of a mark is "often associated with the particular category of 'distinctiveness' into which a mark falls (i.e., arbitrary, suggestive, or descriptive)...." *A & H*, 237 F.3d at 222. However, the category into which the mark falls "is not the only measure of conceptual strength ... The classification of a mark as arbitrary, suggestive, or descriptive is only secondarily used to determine the degree of protection a mark should receive once protectability has been established." *Id.* The degree to which it is protected, in particular, as to defendant's mark, is determined by considering the likelihood of confusion with the defendant's mark.

These two textual marks consist solely of the words "Pocono" and "Raceway." These words describe the location of the racetrack and the service provided, respectively. As such, we find these textual marks to be descriptive.[10]

Turning to the second prong of the test, we find that plaintiff's textual marks have

---

**10.** As recognized by the Court of Appeals, "the classification of a mark as 'descriptive' or 'arbitrary' for the purpose of determining whether it received trademark protection at all...is not dispositive." *A & H*, 237 F.3d at 222. We reiterate that at this point in our analysis, we look to the classification of plaintiff's textual marks not to determine whether they are protectable (we have already determined that these two textual marks are protectable due to their secondary meaning), but rather to determine the marks' strength.

a high level of commercial strength. Plaintiff's two textual marks have been used extensively by plaintiff for several years to identify plaintiff's facility and services. Plaintiff has clearly spent large sums of money to advertise its facility and services using these textual marks. *See* Transcript at 8–18. Plaintiff's textual marks appear on their web site at *www.poconoraceway.com.* Undoubtedly, plaintiff's efforts in advertising utilizing these textual marks has resulted in public recognition. *Cf., A & H,* 237 F.3d at 224 (finding reasonable district court's conclusion that money spent on advertising "undoubtedly resulted in increased public recognition"). Sales have generally increased over the last 22 years. *See* Transcript at 84. In consideration of this evidence, we conclude that the commercial strength inquiry weighs in favor of plaintiff, and the combination of these two inquiries (conceptual and commercial strength) results in a mark strength somewhere between strong and weak.

*3. The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase.*

As indicated above, the Court of Appeals has noted that this factor is the "functional equivalent" of "sophistication of consumers." *A & H,* 237 F.3d at 225. Plaintiff's witness, Mr. Pallo, testified that the price of a ticket to an event at Pocono Raceway ranges from $10 to $375. We find that this broad range in price of tickets suggests that the "sophistication of consumers" would also span a broad range. As such, we find it more than likely that both sophisticated and unsophisticated consumers would purchase these tickets.

*4. The length of time the defendant has used the mark without evidence of actual confusion arising.*

Defendant began operation of its facility under the name "Pocono Mountain Speed-way" on or about October 1, 1999. As described above, plaintiff has offered evidence of several occasions when consumers mistook plaintiff for defendant. *See* supra at 23–24. These numerous incidents of actual confusion occurred within the first year after defendant began operation under the name "Pocono Mountain Speedway." This factor, therefore, weighs in favor of plaintiff.

*5. The intent of the defendant in adopting the mark.*

. As discussed above, the Court has stated that only intent to confuse consumers will be sufficiently probative to weigh this factor in favor of plaintiff. *See A & H,* 237 F.3d at 226. Unlike plaintiff's 708 mark and defendant's logo mark, plaintiff's textual marks and defendant's textual mark are very similar in sight and sound. However, apart from these similarities, there is no evidence that defendant chose its name with the intent to confuse consumers. On the contrary, defendant has offered a reasonable explanation for its choice in names, i.e., geographical location. Although plaintiff offered tenuous evidence that defendant's facility was not in the "Pocono" geographical region, *see* Transcript at 95–96, we find this evidence falls well short of showing that defendant intended to confuse consumers with its name choice.

*6. Evidence of actual confusion.*

As discussed above, plaintiff offered evidence of several occasions when consumers mistook plaintiff for defendant. *See* supra at 439–40. We find these numerous occasions of actual confusion to be compelling evidence of likelihood of confusion. *Cf., A & H Sportswear IV,* 166 F.3d at 203; *F. Schumacher v. Silver Wallpaper & Paint,* 810 F.Supp. 627, 632 (E.D.Pa.1992) (citing *Wearguard Corp. v. Van Dyne–Crotty, Inc.,* 1991 WL 125890 at *3 (E.D.Pa. June

27, 1991)); *see also Elvis Presley Enterprises, Inc. v. Capece,* 141 F.3d 188, 203 (5th Cir.1998); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir. 1980); *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1190 (6th Cir. 1997); *Kendall–Jackson Winery v. E. & J. Gallo Winery,* 150 F.3d 1042, 1048 (9th Cir.1998); *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1166 (11th Cir.1982); *Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F.Supp. 1513, 1547 (S.D.Tex.1996).

*7. Whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media.*

As discussed and concluded above, *see* supra at 435, plaintiff and defendant market their goods and/or services through the same channels of trade and advertise through the same media.

*8. The extent to which the targets of the parties' sales efforts are the same.*

As discussed and concluded above, *see* supra at 435–36, plaintiff and defendant target the same consumers.

*9. The relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors.*

As described above, both plaintiff and defendant are in the business of providing racing facilities for racing fans. However, also as indicated above, defendant would argue that the service and/or goods that it provides differs from that of plaintiff in that defendant's facility holds a different type of event than does plaintiff's facility. Like our conclusion above, we find it more credible that these two facilities provide, to the average consumer, nearly identical goods and services, i.e., racing facilities.

*10. Other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendants' market, or expect that the prior owner is likely to expand into the defendants' market.*

As no relevant evidence falling outside the scope of the first nine factors was introduced, we will not give this final *Lapp* factor any consideration.

*Conclusion*

In consideration of the above ten (10) *Lapp* factors as they apply to plaintiff's two textual marks, we conclude that defendant's "Pocono Mountain Speedway" mark does pose a strong likelihood of confusion with plaintiff's two textual marks, "Pocono Raceway" and "Pocono" as applied to automobile racetrack facilities. Thus, having established a likelihood of confusion between defendant's "Pocono Mountain Speedway" mark and plaintiff's "Pocono Raceway" and "Pocono" marks, plaintiff is entitled to relief on its unfair competition claims.

*Federal Dilution Claim*

The Federal Trademark Dilution Act of 1995 provides:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125(c)(1). As articulated by the Court of Appeals in *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.,* 212 F.3d 157, 163 (3d Cir.

2000), to obtain relief under the federal dilution act, plaintiff must prove:

1.   The plaintiff is the owner of a mark that qualifies as a "famous" mark in light of the totality of the eight factors listed in § 1125(c)(1),

2.   The defendant is making commercial use in interstate commerce of a mark or trade name,

3.   Defendant's use began after the plaintiff' mark became famous, and

4.   Defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.

A district court may consider the following eight non-exclusive factors in determining the famousness of the mark in question:

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods and services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1)(A)-(H).

The fourth required showing, dilution, can be established by a showing of "blurring." [11]  In considering a claim of dilution by blurring, the Court in *Times Mirror* indicated that a district court may consider the following factors: (1) similarity of the marks; (2) similarity of the products covered by the marks; (3) sophistication of consumers; (4) predatory intent; (5) renown of the senior mark; and (6) renown of the junior mark. *Times Mirror*, 212 F.3d at 168–169.  The Court also suggested that a district court may consider additional factors including actual confusion and likelihood of confusion, shared customers and geographic isolation, the adjectival quality of the junior user, and the interrelated factors of duration of the junior user, harm to the junior user, and delay by the senior user in bringing the action.   *Id.*

In *Times Mirror*, the Court disagreed with the defendants' argument that a mark that is merely descriptive cannot qualify for protection under the Dilution Act *Id.* at 165–168.  The Court held that a mark that has obtained secondary meaning has, as a result, obtained the "distinctiveness" required by the Dilution statute.   *Id.*

■  Based on our above findings and conclusions pertaining to plaintiff's trademark infringement and unfair competition claims, we find that plaintiff has satisfied the first three requirements of a federal dilution claim for its two textual marks, "Pocono Raceway" and "Pocono." [12]  These

---

**11.**   Plaintiff also argues that dilution can be established by a showing of "tarnishment." Because this theory of dilution has not yet been recognized by the Court of Appeals for the Third Circuit, and because of our conclu-sions on plaintiff's other theories for relief, we will not address dilution by tarnishment.

**12.**   Also based on our findings and conclusions above, we find that plaintiff has failed to show that its 708 mark is famous or that defen-

two textual marks qualify as "famous" marks in light of the totality of the eight factors listed in § 1125(c)(1) as they (A) have acquired distinctiveness, i.e., secondary meaning, see supra at 437–40, (B) have been in continuous use for several years in connection with the goods and services provided by plaintiff, (C) have been used for several years in extensive advertising, (D) are used in advertising on a national scope, (E) are used in advertisements in various media such as television and print, (F) have become widely recognized in the trading areas and channels of trade used by both plaintiff and defendant, (G) have not been used by third parties in the realm of auto racing, and (H) the textual mark "Pocono Raceway" has been registered. Defendant is making commercial use in interstate commerce of a similar mark, i.e., "Pocono Mountain Speedway." Defendant's use began after plaintiff's textual marks became famous.

Turning to the final element of plaintiff's dilution claim, i.e., dilution, we apply the suggested factors listed in *Times Mirror* that we feel relevant to the case at hand. Again, many of these factors have been discussed above in our trademark infringement analysis. Plaintiff's and defendant's textual marks are very similar to one another, see supra at 440, as are their goods and services, see supra at 442. The sophistication of consumers spans a broad range, see supra at 440–41. Defendant has displayed no predatory intent, see supra at 441–42. Based on their respective years in business, see supra at 441, and their respective expenditures on advertising, see supra at 440, we find that plaintiff's textual marks are very well known, whereas defendant's mark is not. There have been several incidents of actual confusion, see

dant's use of its logo mark dilutes plaintiff's 708 mark. As such, plaintiff's dilution claims

supra at 439–40. Based on our conclusion above, we find that there is a strong likelihood of confusion, see supra at 442. Plaintiff and defendant share common customers, see supra at 435–36. Defendant had only been using its textual mark for less than a year when plaintiff asked defendant to cease and desist from using the mark. After weighing these factors, we conclude that plaintiff's textual marks are diluted by defendant's textual mark.

*Fair Use Defense*

As to all of plaintiff's claims, defendant argues that it is entitled to the benefit of the fair use doctrine. However, where the use of another's mark creates a likelihood of confusion among consumers as to source, affiliation, or sponsorship, the fair use defense is unavailable. *See Pebble Beach Company v. Tour 18 I. Ltd.*, 942 F.Supp. 1513, 1553 (S.D.Tex.1996); cf., *Hypertherm v. Precision Products*, Inc., 832 F.2d 697, 700 (1st Cir.1987); *Smith v. Chanel*, 402 F.2d 562, 569 (9th Cir.1968); *G.D. Searle & Co. v. Hudson Pharmaceutical Corp.*, 715 F.2d 837, 841 (3d Cir. 1983); *Zatarains*, 698 F.2d at 791; *Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F.Supp. 96, 134 (S.D.N.Y. 1989). Because we have concluded that plaintiff's two textual marks have obtained secondary meaning and that defendant's confusingly similar textual mark is likely to confuse consumers as to the origin of defendant's goods and services, defendant cannot benefit from the defense of fair use.

*Cyberpiracy Claims*

As codified at 15 U.S.C. § 1125(d), a claim of cyberpiracy requires a showing

as to the 708 mark will be denied.

of "bad faith intent to profit from" the mark in question. As we have discussed above, we find no existence of bad faith intent on the part of defendants. As such, plaintiff's claims of cyberpiracy must fail.

*Common Law and State Law Claims*

Because we find that the elements required to prevail on plaintiff's common law and state law claims are nearly identical to those required by federal law under the Lanham Act, the above analysis and conclusions apply equally to plaintiff's common law and state law claims. *See* 54 Pa.C.S.A. §§ 1123 and 1124.

## CONCLUSIONS OF LAW

Consistent with the foregoing findings of fact and discussion, we state the following conclusions of law pursuant to Fed. R.Civ.P. 52(a);

1. Plaintiff has not met its burden of establishing a likelihood of confusion as to its 708 mark.

2. Plaintiff has established that its two textual marks, "Pocono Raceway" and "Pocono", have obtained secondary meaning.

3. Plaintiff has met its burden of establishing a likelihood of confusion as to its two textual marks, "Pocono Raceway" and "Pocono".

4. Plaintiff has not met its burden of establishing that its 708 mark is famous.

5. Plaintiff has met its burden of establishing that its two textual marks, "Pocono Raceway" and "Pocono", are famous.

6. Plaintiff has met its burden of establishing that Pocono Mountain Speedway's textual mark dilutes plaintiff's textual marks by lessening the capacity of plaintiff's textual marks to identify and distinguish good and/or services.

7. Defendant did not adopt their textual mark in bad faith or with bad intent.

8. Plaintiff is entitled to judgment in its favor as to its claims pertaining to the two textual marks, "Pocono Raceway" and "Pocono." However, the issue of appropriate relief and damages (if any) remains to be determined.

An appropriate Order follows.

## *ORDER*

AND NOW, this 13th day of August, 2001, it is hereby ORDERED as follows:

1. We find in favor of defendant Barry Callavini on all counts;

2. We find in favor of defendant Pocono Mountain Speedway with regard to all claims pertaining to plaintiff's 708 mark;

3. We find in favor of defendant Pocono Mountain Speedway with regard to plaintiff's claim for cyberpiracy (Count XII);

4. We find in favor of plaintiff with regard to all claims pertaining to plaintiff's two textual marks, "Pocono Raceway" and "Pocono";

5. Plaintiff and defendant Pocono Mountain Speedway are ordered to attempt to reach an agreement regarding the necessary corrective action to be taken in order to alter defendant's use of the mark "Pocono Mountain Speedway" such that it is no longer confusingly similar to plaintiff's two textual marks, "Pocono Raceway" and "Pocono". Any corrective action must include, but not necessarily be limited to, removal of the word "Pocono" from defendant's textual mark. Should the parties be unable to reach a settlement on corrective action within sixty days of the entry of this Order, the Court shall enter an order imposing appropriate alterations;

6. Defendant Pocono Mountain Speedway shall have sixty days from the entry of

this Order to comply with the provisions of this injunction;  and

7.   A hearing as to the outstanding issues will be scheduled forthwith.